DAVID VERBANCE, Plaintiff-Appellee, v. RONALD ALTMAN, Defendant-Appellant.

Second District   No. 2—00—1275

Opinion filed August 16, 2001.—Rehearing denied September 21, 2001.

Steven L. Larson and Linda E. Spring, both of Wildman, Harrold, Allen & Dixon, of Waukegan, for appellant.

David E. Rapoport, of Rapoport Law Offices, P.C., of Chicago, for appellee.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiff, David Verbance, filed this medical malpractice suit against his urologist, Dr. Ronald Altman, following a failed laparoscopic procedure to remove a kidney stone. The defendant appeals from a jury verdict of $511,836.78 entered against him, arguing that the trial court erred in (1) overruling his objection to the causation testimony of Dr. Carey Dachman, one of the plaintiff's opinion witnesses; (2) overruling his objection to the testimony of Dr. Goldrath, one of the plaintiff's witnesses, on the grounds that the plaintiff failed to disclose Dr. Goldrath as an opinion witness; (3) denying his motions

for a directed verdict and for judgment notwithstanding the verdict; (4) giving the issues jury instruction that was tendered by the plaintiff; (5) giving the circumstantial evidence jury instruction that was tendered by the plaintiff; (6) refusing to give the special interrogatory tendered by the defendant; and (7) overruling his objections to the plaintiff's closing argument. Due to page limitations, only the first issue is included in the published portion of the case, with the remaining six issues designated as nonpublishable pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

The plaintiff consulted the defendant when he experienced pain resulting from a kidney stone. The defendant agreed to perform a laparoscopy to remove the stone. During the surgery, the defendant was unable to remove the stone. A few days later, another urologist, Dr. Goldrath, performed a laparoscopy. When he injected dye into the plaintiff's bladder, he noted that the dye leaked out of the bladder. He then successfully removed the kidney stone. Following the surgery, urine leaked out of the plaintiff's bladder. For a four-year period following the surgery, the plaintiff experienced great pain in his groin area, for which he sought treatment from a number of medical providers. The pain ultimately resolved after surgery to block the plaintiff's genitofemoral nerve.

The defendant filed a motion *in limine* to bar Dr. Carey Dachman, one of the plaintiff's treating physicians, from giving proximate cause testimony. The defendant argued that Dr. Dachman was not qualified to give such testimony. The trial court denied the motion.

At trial, the defendant, a urologist at Good Shepard Hospital, testified as to how he performed the laparoscopy on July 31, 1992. After the plaintiff was anesthetized, the defendant inserted a cytoscope into the plaintiff's urethra through his penis. He pushed the cytoscope into the bladder, allowing him to see inside the bladder. He then performed a cystoscopy, which revealed normal findings in the bladder.

The defendant then performed a retrograde examination of the ureter, a procedure in which dye is injected through a catheter into the ureteral orifice, which is the opening to the ureter. During the procedure, the defendant saw the kidney stone. He then removed the catheter and inserted a guidewire. He was able to visually follow the path of the guidewire via fluoroscope as it traveled up the ureter. He then saw the end of the guidewire curled in the kidney, which indicated that the guidewire was properly placed within the ureter.

The defendant then inserted a dilating balloon over the guidewire, through the cytoscope, and into the ureter. Using the guidewire, he placed the balloon into the ureteral orifice and then into the ureter. The balloon lost pressure as it began to inflate. The dye contained in

the balloon was no longer visible on the fluoroscope screen. He withdrew the balloon and observed some bleeding from the ureteral orifice, which is a common during this type of surgery. Sometime thereafter, the guidewire slipped out.

While maintaining a clear vision of the ureteral orifice, he attempted to replace the guidewire into the ureter. When he attempted to place the guidewire into the ureteral orifice, the wire resisted and did not move more than half an inch. He tried to place the guidewire four or five times. He then performed a retrograde injection and saw dye going outside the urinary tract. This indicated that there had been mucosal tear and extravasation of dye outside the normal urinary tract. He then removed all instruments and terminated the operation.

The defendant noted in his operative report that the balloon had burst during dilation. He also stated this to the plaintiff following the surgery. On cross-examination, he admitted that the balloon did not break and further admitted that he did not change his report to reflect this.

The plaintiff sought a second opinion from Dr. David Goldrath, who was also a urologist at Good Shepard Hospital. Five days after the first surgery, Dr. Goldrath performed a ureteroscopic procedure on the plaintiff. Dr. Goldrath testified that the surgeon is supposed to insert the guidewire into the ureteral orifice and hope that the wire finds its way into the ureter.

Dr. Goldrath found that the plaintiff's ureteral orifice had not been dilated. When he injected dye into the area of the ureteral orifice, it went outside the bladder instead of into the ureter. He testified that this was not a normal finding. When he inserted a guidewire, it did not go into the ureter. The guidewire went outside the bladder and along the path where the dye had gone.

Dr. Goldrath then inserted another lens and saw a large opening through the bladder wall. The hole was next to the actual ureteral orifice. The hole was round and was not irregular in shape. He estimated the size of the hole to be about 15 french, which is about one centimeter and is the size of an inflated balloon dilator.

Because the hole looked like a balloon dilator hole, Dr. Goldrath noted in his report of the surgery that it was apparent to him that the area had been previously dilated during the plaintiff's first surgery. Dr. Goldrath testified that a "false passage" had been created on account of the hole and the apparent dilation. Because there was no evidence of normal ureteral mucosa in the area of the hole, he concluded that the hole was in the bladder and not in the ureter. He did not find any evidence of a dilation hole in the area of the ureteral orifice where it should have been.

Dr. Goldrath testified that he placed the guidewire into the ureteral orifice and passed it into the kidney. He then placed a balloon dilator into the orifice. Next, he removed the balloon dilator and placed the ureteroscope alongside the guidewire into the ureter. The ureter appeared normal and the mucosa was intact. This indicated that the area had not been dilated previously. Dr. Goldrath then successfully removed the stone from the plaintiff's left ureter. Dr. Goldrath was not asked any questions regarding his opinions on the breach of the standard of care or causation.

Prior to Dr. Goldrath's testimony, the defendant orally moved to bar Dr. Goldrath from testifying on the ground that the plaintiff had not disclosed Dr. Goldrath as an opinion witness in accordance with Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)). The trial court denied the motion. On cross-examination, the defendant asked Dr. Goldrath whether he had an opinion as to whether the defendant had breached the standard of care, to which he responded that he had no opinion.

Dr. Joseph Davis testified for the plaintiff as a retained opinion witness. Dr. Davis testified that Dr. Goldrath's findings were abnormal and unusual. He testified that Dr. Altman violated the standard of care and that the violations caused damages. He opined that the defendant had not properly placed the balloon, as evidenced by the dye going outside the bladder, causing damage to the periureteral tissue. He also testified that the bladder perforation was caused by the defendant's violations of the standard of care. He based that opinion on the findings of Dr. Goldrath that a hole existed in the bladder, that the ureteral orifice was intact, and that there was no evidence of trauma to the plaintiff prior to the surgery and on the fact that Dr. Goldrath successfully performed the stone removal.

Dr. Davis testified that urine, dye, and instrumentation had passed through the bladder hole and into the area outside the bladder. He opined that urine was extravasating into the plaintiff's retroperitoneum for at least 10 to 14 days after the injury. The hole was near the bottom of the bladder such that, when the plaintiff moved, urine must have leaked out.

Dr. Davis testified that, even if the defendant's version of the facts was true, the defendant violated the standard of care. In a hypothetical question assuming the defendant's version of the facts, Dr. Davis testified that, at the time that the defendant observed bleeding and knew that there was extravasation of dye on the second attempt at retrograde, the defendant should have stopped the operation and should not have tried to blindly put the guidewire in. Dr. Davis opined that the defendant should not have made four or five attempts to get access to the ureteral orifice.

On cross-examination, Dr. Davis testified that, at times during a ureteroscopy, the guidewire punctures a hole in the ureter, which does not necessarily indicate negligence on the part of the surgeon. It is also recognized that bleeding can occur after dilation.

Dr. Carey Dachman, who was board certified in internal medicine, rheumatology, and clinical pain management, testified as one of the plaintiff's treating physicians. He testified that he first saw the plaintiff on April 14, 1995, at which time he took a history of the plaintiff's pain symptoms. The physical examination of the plaintiff revealed dysesthesia, an abnormal sensation on the inside left thigh. That meant that there was a localized nerve irritation. He also ordered an EMG and MRI scan, which were normal. Dr. Dachman diagnosed the plaintiff with causalgia and a regional myofascial syndrome. Dr. Dachman opined that the genitofemoral nerve more likely than not was damaged based on the locale of the dysesthesia.

Dr. Dachman also described his treatment of the plaintiff. Over a period of approximately four years, he prescribed medications to help reduce the nerve irritation and muscle spasm. He also gave him injections and recommended physical therapy and acupuncture. Due to the plaintiff's continuing pain and resulting depression, Dr. Dachman referred him to a neurosurgeon to have the genitofemoral nerve either blocked permanently or cut.

Dr. Dachman testified that, in October 1998, Dr. Starling, a neurosurgeon, performed a genitofemoral neurectomy on the plaintiff. Following the surgery, the plaintiff's condition improved markedly. Eventually, the plaintiff did not have any additional pain in the genitofemoral region. During Dr. Dachman's last physical of the plaintiff, on March 11, 2000, Dr. Dachman noticed that the plaintiff had no significant pain. He had no additional treatment recommendations.

Dr. Dachman's medical records were admitted into evidence without objection. In his first written summary of the plaintiff's condition, dated December 16, 1995, Dr. Dachman noted that the plaintiff had causalgia secondary to initial ureteral extravasation, genitofemoral nerve neuropathy, femoral plexopathy, and fibrosis most likely present secondary to the extravasation.

Regarding the cause of the plaintiff's condition, Dr. Dachman testified that there was

> "no question that something happened during the surgery that caused the genitofemoral nerve injury. On the basis of the history, it appears to be the extravasation. *** All I am aware of historically is the extravasation; therefore, I talk about the extravasation as causing nerve injury. Perhaps that or something else, I am not certain of, but something during that surgery, did, indeed cause the nerve injury."

On cross-examination, Dr. Dachman could not identify any specific mechanism of injury and could not explain why extravasation would cause a genitofemoral nerve injury.

Frankie Siatta, a registered nurse, was called by the plaintiff. Siatta was the circulating nurse during the plaintiff's surgery with the defendant. Siatta observed that the defendant was irritated, impatient, and aggravated during the surgery. The defendant also made unsubstantiated complaints about the equipment and supplies in the room. She heard the defendant say that the balloon had ruptured, causing damage and bleeding. She later inspected the balloon, and reinflated it a number of times without a problem. She concluded that the balloon was not damaged.

The plaintiff testified that he was 39 years old and married with two children at the time of trial. He had a master's degree in business and worked on the investment side of an insurance company. Prior to July 31, 1992, he had been very active in bowling, golf, basketball, and racquetball. He had no pain in his testicle, groin, or thigh.

Following the surgery with the defendant, the pain was so bad he was "crying like a baby. *** The pain was significantly worse than it was at the worst point of the pain with the stone." He described the pain as feeling "like somebody had a wrench on my left testicle." He remained on a morphine pump for pain until the time of his second surgery with Dr. Goldrath. After Dr. Goldrath removed the stent he had placed during the surgery, the plaintiff continued to feel pain, which had gotten progressively worse. He continued to see Dr. Goldrath for approximately one year and had various tests performed to ascertain the source of the pain. The pain "originally started out where it was just sort of some testicle pain. *** And then it radiated into my groin area very firmly. *** The worst part was the testicle pain, the left testicle pain. Then it radiated into my thigh."

Dr. Goldrath eventually referred him to Dr. Magee, a pain management specialist. Dr. Magee gave him injections for his pain. Although the injections in his groin were very painful, they helped relieve the pain in his testicle for a while. However, the pain in his thigh and groin got worse, and the hip flexor muscle that ran from his hip to his groin was "getting ripply." Thereafter, any physical activity, including walking, was painful.

The plaintiff saw several doctors and was eventually referred to Dr. Dachman in 1995. He had injections and physical therapy with Dr. Dachman and also took pain medication and muscle relaxers. In 1998, he was referred to Dr. Starling, who performed surgery "to cut the nerve." A few weeks after the surgery, the pain started to subside.

The pain that he suffered following the operation strained his re-

lationship with his wife and made him irritable. He did not want to be around anyone due to the pain. He missed work due to the pain but did not claim lost wages. There was never a time between the surgeries performed by Dr. Altman and Dr. Starling that he was pain free. He was on pain medications during that entire time.

Dr. Dennis Pessis, a urologist, testified for the defendant that he had met the standard of care in performing the surgery and in attempting to replace the guidewire. He testified that there is always a possibility of creating a hole in the ureter in this type of surgery. On cross-examination, however, he admitted that, if the urologist is "in the bladder" and has dilated a hole, it would be a violation of the standard of care.

Dr. Pessis testified that he has had cases where dye or urine extravasated during a ureteroscopic procedure; such an occurrence is a recognized complication. When the removal of a kidney stone required open surgery, urine and dye would bathe the area of the genitofemoral artery. In such cases, he had never seen a patient who suffered an injury to his genitofemoral nerve as a result. Therefore, Dr. Pessis testified that he could not see any relationship between the surgery performed by the defendant and the plaintiff's nerve injury.

Dr. Jeffrey Kramer, a neurologist with a specialty in dizziness disorders, also testified for the defendant. He testified that the operation performed by the defendant did not cause damage to the plaintiff's genitofemoral nerve. If a person is lying on his back, gravity would pull any extravasation of urine or dye away from the genitofemoral nerve. In addition, there are other structures that the fluid would have to pass to reach the genitofemoral nerve. Because there was no evidence of any injury to those other structures in the plaintiff's case, Dr. Kramer reasoned, there was no evidence that the plaintiff's genitofemoral nerve was damaged by urine or dye. However, on cross-examination, he admitted that testicular pain is a symptom of irritation of the genitofemoral nerve.

Dr. Kramer further testified that his understanding that the plaintiff first complained of genitofemoral pain three weeks after surgery indicated that the surgical procedure did not injure the nerve because a nerve injury would cause immediate pain. However, on cross-examination, Dr. Kramer acknowledged that the initial notes made by nursing staff following the surgeries indicated that the plaintiff complained of pain. In addition, Dr. Kramer acknowledged that his office did not have a device to test for the presence of genitofemoral nerve damage but that the clinic where the plaintiff was tested had such equipment.

The trial court denied the defendant's motion for a directed verdict

at the close of the plaintiff's case. The trial court accepted, over the defendant's objection, the plaintiff's issues instruction, which recited two issues: "a. [c]reating a hole in the bladder with a guidewire; and b. [f]ailing to stop the surgery once it became apparent that it could not be completed safely." The trial court refused the issues instruction tendered by the defendant, which read as follows: "[c]reated a hole in the bladder upon attempting to reinsert the [guidewire]."

Over the defendant's objection, the trial court gave the plaintiff's tendered circumstantial evidence jury instruction.

The trial court also refused to tender the defendant's proposed special interrogatory, which read, "Was Dr. Altman negligent in his attempt to replace the guidewire after it had been expelled from the ureter?" The trial court also refused a revised special interrogatory tendered by the defendant, which read as follows: "Was Dr. Altman negligent in creating a hole in the bladder and attempting to replace the [guidewire] after it was initially expelled from the ureter instead of stopping the procedure?" The jury returned a verdict for the plaintiff for medical care and for pain and suffering.

As an initial matter, we note that the defendant has failed to file the exhibits entered into evidence with the trial court record on appeal. We note that the responsibility for the proper preservation of the record before the trial court rests on the appellant. *In re W.L.W.*, 299 Ill. App. 3d 881, 884 (1998). If the appellant fails to preserve the record for appeal, he waives his right to the review of that record on appeal. *In re W.L.W.*, 299 Ill. App. 3d at 884. Therefore, the defendant has waived any arguments contained in his brief that are unsupported by the record.

## THE CAUSATION OPINION TESTIMONY BY DR. DACHMAN

The defendant's first argument on appeal is that the trial court abused its discretion in overruling his objections to the testimony by Dr. Dachman concerning proximate cause. Relying on *Soto v. Gaytan*, 313 Ill. App. 3d 137 (2000), the defendant argues that Dr. Dachman's testimony was speculative.

In *Soto*, we considered whether the trial court abused its discretion in admitting the testimony of a chiropractor concerning the permanent nature of the plaintiff's injuries. The defendant had argued that the testimony should be excluded because the chiropractor's last examination of the plaintiff was not recent to the time of trial. The trial court rejected this argument, notwithstanding well-settled case law holding that a medical treater may not testify at trial regarding the permanency of a patient's injuries absent a recent examination. *Soto*, 313 Ill. App. 3d at 143.

●1 On appeal, we rejected the plaintiff's argument that the issue of the recency of the examination went to the weight of the testimony, not the admissibility, and that the testimony of the treater should be submitted to the jury without any analysis by the trial court as to the reliability of the testimony. *Soto*, 313 Ill. App. 3d at 144-45. In examining case law concerning the admissibility of an expert's testimony, particularly that by medical treaters, we concluded that the court frequently employs a totality-of-the-circumstances approach in determining whether the testimony is sufficiently reliable to be submitted to the jury. *Soto*, 313 Ill. App. 3d at 145. We noted that, "[a]s the gatekeeper of expert opinions disseminated to the jury, the trial court plays a critical role in excluding testimony *that does not bear an adequate foundation of reliability.*" (Emphasis added.) *Soto*, 313 Ill. App. 3d at 147. We then set forth certain factors that the trial court may consider in determining whether the opinion testimony concerning permanency was sufficiently reliable to submit to a jury. *Soto*, 313 Ill. App. 3d at 147. We concluded that the trial court abused its discretion in permitting testimony concerning permanency that did not bear sufficient indicia of reliability. *Soto*, 313 Ill. App. 3d at 148.

Our supreme court has expressed approval of *Soto*'s gatekeeping approach. *Decker v. Libell*, 193 Ill. 2d 250, 254 (2000). The court noted, "[t]rial courts routinely bar evidence because it is irrelevant or unreliable, and we see no reason to apply a different rule in this context. Under this approach, the trial judge serves in a familiar role as 'gatekeeper,' barring testimony that is not sufficiently relevant or reliable to be admitted into evidence." *Decker v. Libell*, 193 Ill. 2d at 254.

In the present case, the defendant filed a motion *in limine* to bar Dr. Dachman from testifying as to proximate cause, arguing that Dr. Dachman's testimony was based upon guess and speculation in that Dr. Dachman testified that he did not know whether the defendant's attempt to replace the guidewire caused the plaintiff's nerve injury. In denying the defendant's motion, the trial court indicated that it was considering "the factors" from *Soto*. The trial court pointed to the following factors in ruling Dr. Dachman's testimony admissible: that Dr. Dachman was a treating rheumatologist; that the plaintiff had specifically sought out Dr. Dachman for treatment of the pain that began after the surgery; that the plaintiff had described to Dr. Dachman the onset of the pain; and that Dr. Dachman has expressed "a strong opinion in his judgment that there's a causal relationship."

The defendant also objected to the causation opinions during Dr. Dachman's direct testimony, which the trial court overruled. The testimony concerning causation that the defendant objected to is as follows:

"I believe that there is no question that something happened during the surgery that caused the genitofemoral nerve injury. On the basis of the history, it appears to be the extravasation. *** All I am aware of historically is the extravasation; therefore, I talk about the extravasation as causing nerve injury. Perhaps that or something else, I am not certain of, but something during that surgery, did, indeed cause the nerve injury."

The main problem with the defendant's argument is that he does not attack the reliability of Dr. Dachman's opinion but, rather, would like for us to conclude that Dr. Dachman's testimony was weak and untenable. This is not a viable argument on appeal. The defendant's attack on the quality of Dr. Dachman's testimony is evident by the fact that the defendant bases much of his abuse of discretion argument on the testimony the defendant elicited on cross-examination. The defendant would have us review the direct and cross-examination testimony to determine that Dr. Dachman's testimony was insufficient to survive the motion *in limine* and the objection during direct examination. This is not the purpose behind *Soto*'s gatekeeping approach.

The defendant clearly misapprehends *Soto*. In *Soto*, we acknowledged the trial court's gatekeeping role because the rules of evidence grant expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. See generally *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 143 L. Ed. 2d 238, 250, 119 S. Ct. 1167, 1174 (1999). For instance, experts may testify to opinions, including those that are not based on firsthand knowledge or observation. Experts tie observations to conclusions through the use of general truths derived from specialized experience. *Kumho*, 526 U.S. at 148, 143 L. Ed. 2d at 250, 119 S. Ct. at 1174. The expert's testimony will often rest upon an experience that is foreign to the jury. *Kumho*, 526 U.S. at 149, 143 L. Ed. 2d at 251, 119 S. Ct. at 1174-75. The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience. *Kumho*, 526 U.S. at 149, 143 L. Ed. 2d at 251, 119 S. Ct. at 1174-75.

The objective of *Soto*'s gatekeeping requirement is to ensure the reliability and relevancy of an expert's testimony. It is to make certain that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. See generally *Kumho*, 526 U.S. at 152, 143 L. Ed. 2d at 252, 119 S. Ct. at 1176. A trial judge must have considerable leeway in deciding in a particular case how to go about determining whether a particular expert's testimony is reliable. See generally *Kumho*, 526 U.S. at 152, 143 L. Ed. 2d at 252, 119 S. Ct. at 1176.

We believe that the trial court did an excellent job of explaining the gatekeeping role under *Soto:*

"[J]ust because the expert says he is qualified does not mean he is qualified, and we charge that duty and obligation upon the shoulders and the back of the trial court, if you will, to go into a more intense analysis in the adversarial system."

*Soto* clearly does not stand for the proposition that the court is to examine the treater's conclusion and ask whether it makes any sense. *Soto* stands for the proposition that the court should look at the basis behind the formation of the opinion and ask whether the foundation is really there.

•2 In this case, we do not believe that the trial court abused its discretion under *Soto*. The purpose for our decision in *Soto*, approved by our supreme court in *Decker*, was to compel the trial court to analyze thoughtfully whether medical testimony bears sufficient indicia of reliability to be submitted to a jury rather than simply to rubber-stamp opinion testimony just because it happens to come from a medical professional. Under *Soto*, the trial court has the discretion to bar medical testimony that lacks any basis.

Far from what occurred in *Soto*, in the present case it is clear that, when Dr. Dachman's testimony was challenged by the defendant, the trial court specifically undertook a review of the basis of Dr. Dachman's testimony and found that it was sufficiently reliable to submit to a jury. The trial court's statement that it was considering "the factors" from *Soto* was technically incorrect, since *Soto* suggested factors to consider in determining whether testimony concerning permanency is sufficiently reliable. Nonetheless, we are persuaded that the trial court's consideration of Dr. Dachman's specialty, the plaintiff's history that he obtained, and the treatment Dr. Dachman provided were in keeping with the spirit of *Soto*.

It is apparent that the defendant has a poor opinion of Dr. Dachman's testimony that "something must have happened." Once again, the defendant asks us to pass judgment on the quality of the evidence rather than confining our review to the existence of a basis for the testimony. Whether we believe that Dr. Dachman's testimony was weak is irrelevant in this context. What is relevant is that Dr. Dachman testified that he is a pain specialist, took a history from the plaintiff including the type and onset of the pain, treated the plaintiff over a period of years, prescribed therapy and medications to no avail, and ultimately approved of a neurectomy, which provided the plaintiff with relief. It is clear from the foregoing that Dr. Dachman had a sufficient basis to form an opinion as to the cause of the plaintiff's pain regardless of how strongly that opinion came across in court. Any

arguments by the defendant concerning the quality of the conclusions formulated by Dr. Dachman should have been addressed in cross-examination and in closing argument. In addition, we note that Dr. Dachman's opinions regarding causation were contained in his early reports concerning the plaintiff. Those reports were admitted into evidence without objection, and it would be foolish indeed to bar Dr. Dachman from testifying about his own reports that were properly admitted into evidence. Because we are persuaded that the trial court undertook the proper review of Dr. Dachman's testimony under *Soto*, we hold that the trial court did not abuse its discretion in admitting the testimony.

A recent medical malpractice case is particularly helpful to our analysis. In *Snelson v. Kamm*, 319 Ill. App. 3d 116 (2001), the defendant-physician argued that the trial court abused its discretion in permitting the testimony of the plaintiff's nontreating expert, who had opined that the defendant was negligent in failing to perform re-vascularization surgery to restore the plaintiff's blood circulation. *Snelson*, 319 Ill. App. 3d at 135. The defendant made a foundational objection, arguing that the expert lacked certain clinical experience and that no medical literature existed that would support the expert's theory. The reviewing court rejected the defendant's arguments, noting that the expert had reviewed many reports and other information relevant to the case.

The court also commented upon the appropriateness of the defendant's arguments. The court noted that the defendant's arguments concerned the quality of the testimony offered by the defendant:

"Although [the defendant] has alleged several ways in which [the expert's] opinion is flawed, he has not demonstrated that [the expert's] opinion included 'so many varying and uncertain factors' that he was required to guess to reach his conclusions. Instead, [the defendant's] concerns constitute appropriate topics for cross-examination." *Snelson*, 319 Ill. App. 3d at 136.

As in *Snelson*, we are persuaded that the defendant in this case has not attacked the reliability of the basis of Dr. Dachman's opinion but, rather, has attempted to persuade us that Dr. Dachman's testimony was weak. The defendant has misconstrued the requirements of *Soto*, namely, that the trial court engage in a thoughtful analysis of whether an expert's testimony bears sufficient indicia of reliability by examining the factors that comprise the basis for the opinion. In this case, the trial court did not abuse its discretion in permitting Dr. Dachman to offer testimony on causation.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

O'MALLEY and GROMETER, JJ., concur.