THIRD DIVISION

February 6, 2002

No. 1-01-0943

JANICE FRIEDMAN, ) Appeal from the 

) Circuit Court of

) Cook County.

Plaintiff-Appellant, ) 

)

)

v. ) No. 96 L 01314

)

)

SAFE SECURITY SERVICES, INC.,   )

and COMMAND SECURITY CORP. d/b/a   ) 

CSC SECURITIES SERVICES, )

) The Honorable

) Deborah Mary Dooling,

Defendants-Appellees. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

Plaintiff Janice Friedman ("Friedman"), a psychologist, treated patients in an office suite located on the 20th floor of the Garland building in Chicago.  L.J. Sheridan & Co. ("L.J. Sheridan") was the property management company responsible for the Garland building.  One of its responsibilities included contracting with defendant Safe Security Services, Inc. ("Safe Security") to provide security services for the building's tenants.

On May 10, 1994, an unidentified intruder sexually assaulted Friedman in her office suite.  Friedman brought an action for damages against Safe Security contending that Safe Security was negligent in securing the Garland building and that such negligence was a proximate cause of her sexual assault by an unknown intruder.  L.J. Sheridan was not sued.  In August 2000, a jury was selected and the case was tried until the trial judge granted Safe Security's motion for a directed verdict "due to the lack of evidence as to the element of causation."  

On appeal, Friedman contends the trial court erred (1) in granting defendant's motion 
in
 
limine
 barring certain opinions of Friedman's security expert, Gerald Brandt, regarding proximate cause; (2) in granting defendant's motion for a directed verdict; and (3) in disregarding the testimony of defense witness George McAlister when it ruled on defendant's motion for a directed verdict. 

We affirm.

FACTS

On Tuesday, May 10, 1994, Dr. Janice Friedman went to work in her office suite in the Garland building in Chicago.  She saw patients all day.  At about 7:00 p.m., she tidied the office, checked the answering machine, turned off the lights, and headed home.  As she opened her office door to leave, she heard the elevator -- the elevator was across the hall, directly in front of her office door.

Friedman did not reach the elevator.  As she opened the office door, an intruder suddenly thrust her back into her office and threw her to the floor.  From her vantage point, inside her office and behind the door, she could not see where the intruder came from.  She did not know whether the intruder had just exited the elevator and rushed the office door or whether he was in the hallway waiting for her to open the door.  

The unknown intruder, wearing a T-shirt, jeans, and big, dark sunglasses, entered Friedman's office.  He held a knife to her throat and sexually assaulted her.  The identity of the intruder was and is unknown.

After sexually assaulting Friedman, the intruder tied her up and told her not to move for ten minutes.  He then left.  About ten minutes later, Friedman left her office, went to the building's lobby, saw defendant's employee, security guard George McAlister -- he had been on duty since 5:00 p.m. -- and called her husband.  A short time later, Friedman's husband arrived and took her to Northwestern Memorial Hospital emergency room.  Friedman received treatment for her physical injuries and was released.

After filing suit against Safe Security, Friedman retained Gerald Brandt ("Brandt") to give his expert opinion on the issue of building security.  At the outset of the trial, Safe Security filed a motion 
in
 
limine
 to preclude Friedman's expert, Brandt, from opining: (1) the intruder entered the building immediately before, or some short time before, sexually assaulting Friedman; and (2) the intruder walked through the front door of the building, past the person occupying the security desk, and rode up the elevator to Friedman's office.  

Safe Security contended Brandt's opinions had no basis in fact and were pure surmise and conjecture.  After an extensive hearing, the trial court agreed.  It barred Brandt from giving those opinions.

At trial, Brandt testified he was the owner of Baker Eubanks, a security guard and security consulting company.  Brandt's company had been located in the Garland building since 1998.

Brandt held a license required by the State of Illinois to operate his company and he possessed a private detective's license.  He had taught courses in security, both as a police officer and in the private sector.  He explained to the jury the requirements of becoming a security guard/officer in Illinois and what it was to work as one.  He also explained his familiarity with post orders ("instructions to the guard to tell him what to do at the specific location at various times of the day"), guard reports ("a document that a guard should fill out *** to indicate anything *** that occurred on his post during the course of the evening"), security manuals (a larger, more detailed version of the post orders), and other materials relevant to a building's security operation.  

In formulating his opinions regarding Safe Security and its breaches of standards of care in securing the Garland building on May 10, 1994, Brandt reviewed the depositions of plaintiff Janice Friedman; George McAlister, the security guard on duty at the time of Friedman's sexual assault; Lucy Sliepka, a representative of L.J. Sheridan; and Charles Saul, the vice president and senior representative of L.J. Sheridan.  He also reviewed police reports relating to the investigation of Friedman's sexual assault, the guard report and sign-in sheets for the evening of the assault, reports reflecting a prior sexual assault in the building, and other documents.  Brandt also inspected the Garland building, despite his familiarity with parts of it.

Brandt offered the jury three opinions with respect to Safe Security and its breaches of standards of care on May 10, 1994.  First, he opined George McAlister's security guard report from the evening of May 10, 1994, did not comply with proper procedures for filling out a guard report in the security industry.  Most significantly, McAlister's guard report failed to show he was relieved at any time.  

According to Brandt, "It would be extremely unusual for a security officer to go to a post and remain there for eight hours."  Because McAlister's report did not show he was relieved on the evening of May 10, 1994, Brandt concluded the guard report showed he abandoned his post -- the security desk in the lobby of the Garland building -- throughout the evening and abandoned his post without appropriate relief.

Second, Brandt opined the sign-in sheet from the evening of May 10, 1994, confirmed McAlister must have been away from his post throughout the evening.  Brandt testified that beginning at 5:30 p.m. a visitor to the Garland building was required to sign in at the security desk in the lobby and indicate which suite he or she was visiting.  Likewise, the visitor was required to sign out when he or she left the building.  

Brandt said the sign-in sheet from the evening of May 10, 1994, was not accurate or complete.  Specifically, visitors wrote suite numbers for nonexistent suites, or did not write down a suite number, and others left their sign-out time blank.  Brandt noted that a substantial number of these inaccuracies involved a period of time he contended the intruder must have entered the building.

Brandt concluded that the sign-in sheets from the evening of May 10, 1994, provided additional evidence McAlister was absent from his post.  According to Brandt, because Safe Security did not have a field supervisor supervising McAlister and did not properly relieve him when necessary, Safe Security and its employee McAlister violated an industry standard for properly maintaining a security post.  

Brandt acknowledged L.J. Sheridan determined the number of security guards Safe Security was to provide and the number of hours that guard was to work.  It was L.J. Sheridan's decision not to have 24-hour security services.  It was L.J. Sheridan's decision to have only one guard on duty from 5:00 p.m. to midnight, and midnight to 7:00 a.m.

Finally, Brandt opined, over Safe Security's objection, that because "the post was not properly manned[,] *** the violator or the offender, in this case, [had] an opportunity to go up to the suite unchallenged, and attack Ms. Friedman."  Brandt further opined the intruder entered the building immediately before the assault.  He found no evidence the intruder planned the assault; he believed it was a spontaneous attack.  

On cross-examination Brandt agreed he had not "found any specific evidence about the time that this individual[, the intruder,] entered the building."  Brandt said, "I don't know that there is specific evidence, but I think there are indications that he was there immediately -- obviously prior to the rape.  I don't believe he was in the building all day, if that's what you're asking me."

Charles Saul, vice president of L.J. Sheridan & Co., was the property manager of the Garland building at the time of Friedman's assault.  He testified for Friedman.  

Saul testified that in 1991 L.J. Sheridan took over property management responsibilities for the Garland building from Hudson Park Management Company.  The building had gone into receivership.  Hudson Park Management Company originally hired Safe Security to provide a single security officer/guard to be stationed in the lobby of the Garland building during non-business hours, i.e., between 5:00 p.m. and 7:00 a.m.  

When L.J. Sheridan took over management responsibilities of the Garland building, it continued the same contractual security service with Safe Security.  Saul could not produce a copy of the contract for security services between L.J. Sheridan and Safe Security.  

According to Saul, Safe Security, through its employees, acted as the security experts for the Garland building.  He said Safe Security wrote the post orders that told the security guard how to perform his duties.  L.J. Sheridan relied on Safe Security to supervise its guard and insure a reasonable level of security. Notwithstanding, Saul acknowledged that L.J. Sheridan "had the final say as to how much security [it was] willing to pay for in that building."

L.J. Sheridan chose not to contract with Safe Security to provide security service for the Garland building between the hours of 7:00 a.m. and 5:00 p.m.  Instead, L.J. Sheridan used its own employee as an "elevator starter."  Although the elevator starter was not a trained security guard, L.J. Sheridan expected its starter to meet and greet people, usher them into the elevator and, at the same time, screen out any undesirables.  

There was no testimony from the elevator starter on duty during the day of May 10, 1994.  We do not know whether that starter actually performed those duties on that day.

With respect to the duties of Safe Security's security guard from 5:00 p.m. to 7:00 a.m. at the Garland building, Saul said he was familiar with the guard's duties.  Specifically, before visitors were supposed to start signing in and out, which was at 5:30 p.m., the guard had the duty to lock off certain doors that would control access to the building.  After performing that duty, the guard was required to post himself at the security desk in the lobby of the building.  The guard was not permitted to patrol the building.

While posting the security desk, the guard had the duty to screen people entering the building.  As part of the screening process, the guard was required to have all persons entering the building after 5:30 p.m. sign in, to verify their authority to be in the building, and to have every person leaving the building after 5:30 p.m. sign out.  If the guard determined a person was an "undesirable," the guard was required to withdraw that person from the building.  All information taken down on the sign-in/sign-out sheet by the guard was expected to be accurate.

In the event the guard had to leave his post, according to Saul, Safe Security was responsible for providing an additional guard to relieve the security guard.  Saul said Safe Security was required to provide such relief on a nightly basis. Saul acknowledged, however, that it was not unusual for the Garland building's engineer, an employee of L.J. Sheridan, to relieve the guard.

Before the close of Friedman's case-in-chief, she offered three additional witnesses: (1) her husband, Theodore Eisenman; (2) a medical psychological expert on sexual assault victims, Nurse Anne Burgess; and (3) her psychiatrist, Charles Hillenbrand.  Each witness's testimony related to the plaintiff's injuries and damages stemming from her sexual assault, although Burgess was allowed to characterize the attack as a "blitz style rape," where no plan was involved.

At the close of plaintiff's case, Safe Security made an oral motion for directed verdict.  The trial judge asked both parties whether there was any objection to proceeding with evidence until the jury's lunch hour, after which the judge would hear full argument on the motion.  Neither party voiced any objection to the judge's suggestion.  

Safe Security proceeded with testimony of a single witness: George McAlister, the security guard on duty in the lobby of the Garland building on May 10, 1994.  At the lunch hour, McAlister's testimony was interrupted and the trial judge excused the jury for lunch.  The judge then reminded both parties Safe Security had made a motion for a directed verdict, and suggested they wait until the lunch hour to argue the motion.  Again, there was no objection from either side.  

Safe Security presented a written motion, and a recess was taken to afford Friedman and the trial judge an opportunity to read it.  After the lunch recess, the judge reconvened outside the jury's presence to hear argument on Safe Security's motion.  Again, there was no objection or reference to the timing of the hearing. 

The court then heard both parties' arguments and granted Safe Security's motion.  After the trial court granted Safe Security's motion for a directed verdict, Friedman filed a motion requesting a new trial.  The trial court, after hearing argument, entered a written order detailing its denial of Friedman's request.  This appeal followed.

DECISION

MOTION 
IN
 
LIMINE

Friedman contends the trial court erred in barring Gerald Brandt's opinion testimony about when the intruder entered the building, particularly testimony that the intruder gained access to the Garland building during a time when McAlister was away from his security post.  

Friedman contends Brandt's opinions were admissible because they were "based in part upon the testimony of Dr. Friedman, who testified she heard the sound of the elevator immediately prior to the attack[,] *** his experience as a police officer, his investigations of violent crime, other law enforcement experience[,] *** his experience in the security field[, and] finally, *** on the sign in sheet for the night of the rape, a guard report, other documents and testimony."

Safe Security responds Brandt's testimony was speculative and properly barred by the trial court.  Safe Security contends Brandt's testimony was based "purely upon speculation and conjecture."  We agree.

Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence.  See 
Hiscott v. Peters
, 324 Ill. App. 3d 114, 122, 754 N.E.2d 839 (2001).  "The decision of whether to admit expert testimony is within the sound discretion of the trial court [citation], and a ruling will not be reversed absent an abuse of that discretion [citation]."  
Reed v. Jackson Park Hospital Foundation
, 325 Ill. App. 3d 835, 842, 758 N.E.2d 868 (2001).

Here, Friedman sought to prove generally, through Brandt's testimony, that Safe Security's breach of the applicable standard of care more probably than not was the cause of Friedman's injury.  Friedman failed to acknowledge, however, the admission of Brandt's testimony required her to lay an adequate foundation establishing that the information upon which he based his opinion was reliable.  "It is the function of the trial court, and not the jury, to determine whether the foundational requirements have been met."  
Hiscott
, 324 Ill. App. 3d at 122-23.  

As the trial court correctly noted, Brandt's opinions were inadmissible because the causal connection he opined to was contingent, speculative, and/or merely possible.  See 
Reed
, 325 Ill. App. 3d at 842-45.  That is, Brandt's opinions assumed the attacker entered the building after 5:00 p.m.

Modelski v. Navistar International Transportation Corp.
, 302 Ill. App. 3d 879, 707 N.E.2d 239 (1999), supports our conclusion. In 
Modelski
, the appellate court reversed the judgment for the defendant in an action for negligence and wrongful death based, in part, on the trial court's error in denying the plaintiff's motion 
in
 
limine
 to bar the defendant's expert witness testimony as speculative, and in denying her motion at trial to strike that testimony.  
Modelski
, 302 Ill. App. 3d at 886-87.

Specifically, the court found the defendant's reconstruction expert had no factual basis to support his opinion that the plaintiff's husband had caused his own death by restarting "the tractor while standing on the ground; whereupon, the tractor moved forward when the engine engaged, knocking Modelski to the ground under the rear axle and causing the Bush Hog to be drawn over him[, killing him]."  
Modelski
, 302 Ill. App. 3d at 885-86. The defendant's expert admitted there was no physical evidence to support his opinion.

The court said, "We would hardly expect ‘expert' opinion testimony to be objective in the traditional sense of the term, but neither would we expect it to take the form of fictional musings as to what might have happened."  
Modelski
, 302 Ill. App. 3d at 886.  From the expert's admissions, the court found it was "quite apparent that his opinions regarding a mechanical breakdown necessitating Modelski to dismount the tractor were based on sheer speculation and should have been stricken as unreliable and totally irrelevant."  
Modelski
, 302 Ill. App. 3d at 886.  

Similarly, here, the record before us is devoid of facts that reasonably could form the basis for Brandt's opinions about when the intruder entered the building or whether the intruder walked past the security desk at a time the guard was not present.  Brandt's own deposition testimony reveals the lack of factual support for his opinions.

At Brandt's discovery deposition, he was asked the following questions and gave the following answers:

"Q: What information do you have to demonstrate the attacker did not enter the building between normal business hours, let's say 9:00 [a.m.] to 5:00 p.m. on the date of the occurrence?

A. 
There is no specific evidence one way or another when the person entered
.  I'm basing my opinion on my experience in law enforcement and then in security that when you determine the time of an incident or an attack, the person entered onto the scene, most likely immediately prior to that time.

Q. Is there any text, treatise, or study citation that you can give me that would support your opinion?

A. 
No
.  
I think it's a commonsense opinion
 is that when a person is committing a crime, it behooves them to spend as little time as possible at the scene.  ***  
So again, it's an opinion in lack of having evidence to support it
.  My opinion is that he entered the facility immediately prior or some short time prior to the incident.

Q. It's your opinion that this person walked in the front door of the building, walked by the person who was occupying the desk, requiring people to sign-in, sign-out?

A. Uh-huh.

Q. And gained access to the building?

A. That's my opinion.

Q. And what evidence do you have for that?

A. 
There is no evidence one way or another
.  
The opinion is based on my experience of criminals
 ***."  (Emphasis added.)

Brandt reiterated his deposition opinion and its basis, over Safe Security's objection, at trial.  

Friedman contends these opinions are supported by 
Decker v. Domino's Pizza, Inc.
, 268 Ill. App. 3d 521, 644 N.E.2d 515 (1994) and 
Verbance v. Altman
, 324 Ill. App. 3d 494, 754 N.E.2d 856 (2001).  We disagree.

In 
Decker
, the plaintiff's expert, a police officer, gave opinion testimony that a "robber beat plaintiff up because he did not believe that plaintiff could not open the safe."  There was a factual basis for the expert's opinion -- a conversation he had with the robber's cellmate.  
Decker
, 268 Ill. App. 3d at 529.  In addition, the appellate court held the trial court did not abuse its discretion by allowing the proffered testimony because the defendant failed to timely object to the expert's hearsay basis for the opinion, which constituted a waiver of the issue.  
Decker
, 268 Ill. App. 3d at 529.  

In 
Verbance
, the appellate court held the trial court had broad discretion in determining whether to admit or exclude expert testimony.  
Verbance
, 324 Ill. App. 3d at 502-03.  Specifically, the court held the trial court had not abused its discretion in allowing the plaintiff's expert to express his opinion about what caused the plaintiff's pain because the trial court made its decision only after it carefully considered the witness's factual basis: the expert's medical specialties, the history he obtained from the plaintiff -- his patient, and the treatment he provided to the plaintiff.  
Verbance
, 324 Ill. App. 3d at 504.

Here, there was no evidentiary basis for the opinions expressed by Brandt.  "Experts cannot base opinions on what may have occurred or what the expert believed might have happened in a particular case."  
Reed
, 325 Ill. App. 3d at 844, citing 
Schuler v. Mid-Central Cardiology
, 313 Ill. App. 3d 326, 335, 729 N.E.2d 536 (2000), and 
Dyback v. Weber
, 114 Ill. 2d 232, 244, 500 N.E.2d 8 (1986).  Brandt did not demonstrate that his opinions were based on anything more than an educated guess.

Brandt did not indicate a reliable, credible foundation for his conclusions that the security post was not properly manned or that the guard sat at his desk as the attacker walked past and therefore had "an opportunity to go up to the suite unchallenged and attack Ms. Friedman."  In short, there is no factual support for the conclusion that the attacker entered the building after 5:00 p.m.  Without those facts, Brandt's testimony was not reliable.  The court did not abuse its discretion in barring his testimony.

DIRECTED VERDICT -- PROXIMATE CAUSE

Friedman next contends the trial court erred in granting Safe Security's motion for a directed finding where, according to Friedman, the testimony of Friedman, Gerald Brandt, and Ann Burgess, as well as other circumstantial evidence, was sufficient to defeat Safe Security's motion and, more importantly, to satisfy the requisite element of proximate cause.

We review a trial court's grant of a directed verdict 
de
 
novo
 (
Susnis v. Radfar
, 317 Ill. App. 3d 817, 825, 739 N.E.2d 960 (2000)), and will affirm that grant where the evidence, viewed in the light most favorable to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand (
Mort v. Walter
, 98 Ill. 2d 391, 396, 457 N.E.2d 18 (1983)).  

In an action for negligence, a plaintiff must set out facts establishing (1) the existence of a duty of care, (2) a breach of that duty, and (3) an injury proximately resulting from that breach.  
N.W. v. Amalgamated Trust and Savings Bank
, 196 Ill. App. 3d 1066, 1071, 554 N.E.2d 629 (1990).  Where the plaintiff has not established a 
prima
 
facie
 case, a directed verdict is appropriate.  See 
Mengelson v. Ingalls Health Ventures
, 323 Ill. App. 3d 69, 74, 751 N.E.2d 91 (2001), citing 
Saxton v. Toole
, 240 Ill. App. 3d 204, 210, 608 N.E.2d 233 (1992).

Here, the trial court declared, "Because plaintiff failed to prove proximate cause, she failed to sustain her burden of establishing a 
prima
 
facie
 case.  Consequently, a directed verdict was proper."  We agree.

Proximate cause exists when the injury is "the natural and probable result of the negligent act or omission and *** of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence."  
Greene v. City of Chicago
, 73 Ill. 2d 100, 111, 382 N.E.2d 1205 (1978).  It is not necessary that the precise injury that occurred was foreseable.  
Greene
, 73 Ill. 2d at 111.

Generally, the question of proximate cause is a question of fact.  
Salinas v. Werton
, 161 Ill. App. 3d 510, 515, 515 N.E.2d 142 (1987).  However, where the material facts are undisputed and reasonable men would not disagree as to the inferences to be drawn from them, proximate cause becomes a question of law.  
Salinas
, 161 Ill. App. 3d at 515.  If, given all the evidence contained in the record, nothing is left to go to the jury, the court is required to direct a verdict.  
Palumbo v. Frank's Nursery & Crafts, Inc.
, 182 Ill. App. 3d. 283, 288, 537 N.E.2d 1073 (1989). 

Although Safe Security expressed a general intent to protect tenants of L.J. Sheridan's property, the Garland building, this purpose and Safe Security's duties were limited by its specific undertaking to provide guard service only between the hours of 5:00 p.m. and 7:00 a.m.  Safe Security did not assume a duty to provide guard service for the protection of tenants in the Garland building between the hours of 7:00 a.m. and 5:00 p.m., and, therefore, did not assume such a duty for Friedman's benefit.  Accord 
Cross v. Chicago Housing Authority
, 74 Ill. App. 3d 921, 930, 393 N.E.2d 580 (1979).

Thus, the question for us on appeal:

Did Friedman provide sufficient evidence to show Safe Security acted or failed to act in some way that allowed the intruder entry and access to her office suite during the hours Safe Security was contractually obliged to act?

Friedman says she presented a great amount of evidence that the rapist entered the building shortly before 7:15 p.m., the time of the attack.  That evidence included: (1) Dr. Friedman's testimony that she heard the elevator door open immediately before she was attacked, at approximately 7:15 p.m.; (2) the elevator starter on duty all day until 5 p.m. screened people entering the building and no evidence was presented that any undesirables entered the building the day of the rape; (3) the building had a low traffic flow on the floors where professionals like Dr. Friedman had their offices, and no one came to her floor without an appointment; (4) in all her years in the building, Dr. Friedman never saw an alcoholic or drug abuser come into the building; (5) the stairwells were locked, prohibiting potential rapists from hiding inside them; (6) the bathrooms on each floor were locked preventing access by unauthorized persons; (7) there was nowhere to hide in the building or on the 20th floor; (8) unrebutted expert testimony established the blitz style nature of the rape - where the rapist quickly enters a building, finds his victims, and attacks with no plan or stalking; (9) immediately prior to the rape, the guard left his post unattended, resulting in easy access for the rapist; and, (10) loitering was never a problem in the building either on the day of the rape or prior to the rape.

The trial court found the evidence offered by Friedman insufficient to "fill in the causation gap" and "puzzling given the lack of anything in the record to support it."  So do we.  

As the trial court correctly found, "None of this circumstantial evidence compensated for the void on the issue of when the rapist entered the Garland building.  Plaintiff simply did not know and the rapist was never apprehended."

Our review of the record shows that the time and manner by which the intruder gained access to the Garland building, and ultimately Friedman's office, can be determined only by engaging in speculation, surmise, and conjecture.  Proximate cause can be established only when there is a "reasonable certainty" that the defendant's acts caused the injury.  See 
N.W.
, 196 Ill. App. 3d at 1076.  Proximate cause cannot be established on the facts of this case.

No one at trial could substantiate the existence of the requisite causal link, and that link is scarcely self-evident.  For example, Friedman contends that because she heard the elevator door open immediately before she was attacked and because expert testimony characterized her assault as a "blitz style rape," the intruder must have gained access to the building just before the assault by the absence of the security guard and/or inadequate access control.  

However, as the trial court pointed out, if the intruder were one of the many visitors to the Garland building who entered before 5:30 p.m., and if he waited for an opportunity to commit the "blitz style rape," no additional actions by Safe Security would have prevented the intruder's assault of Friedman.

Because there was no evidence, direct or otherwise, as to how or when the intruder entered the Garland building, a conclusion that Safe Security's deficiencies were linked in any way to Friedman's assault would be purely speculative.  

It is fundamental that in a negligence action a jury must base its decision on evidence, not on guess or speculation.  
N.W.
, 196 Ill. App. 3d at 1076.  Liability cannot be predicated upon surmise or conjecture as to the cause of the injury.  
Morton v. F.B.D. Enterprises
, 141 Ill. App. 3d 553, 560, 490 N.E.2d 995 (1986).

The circumstances of this case closely resemble those in 
N.W.
  There, a tenant brought a negligence action against the owners and manager of her apartment building to recover damages for injuries she sustained after an intruder broke into her apartment through the kitchen door and sexually assaulted her.  The tenant argued that defendants should be held liable for the attack because (1) they failed to repair the lock on the building's rear entrance, and (2) it was through this unlocked back door that the assailant was able to gain access to the tenant's kitchen door before the assault.  

The identity of the assailant was unknown.  There was no evidence he was not simply another tenant, or a social guest of a tenant, who would have had access to the plaintiff's kitchen door regardless of whether the rear entrance was locked.  Assuming, without deciding, that the assault was reasonably foreseeable or that defendants had, in fact, engaged in a voluntary undertaking to protect the tenant from criminal activity, the court held the tenant's action was defeated.  

The court said: 

"The only piece of evidence supporting the plaintiff on the issue of proximate cause is the fact that the lock was inoperable on the night of the attack and, hence, a mode of access to plaintiff's apartment was available.  From this the plaintiff infers that the assailant entered the building through the unlocked rear entrance.  Such an inference would be quite reasonable but for the fact that access to the plaintiff's kitchen door was also available to other tenants and their social guests.  A mere possibility of a causal connection is insufficient to raise the requisite inference of fact."  
N.W.
, 196 Ill. App. 3d at 1077.

The court affirmed summary judgment in favor of defendants.

Here, the failure of proof on the question of proximate cause is no less evident.  The law of this State does not support a reversal of the trial court's decision.

We have confined our analysis to the proximate cause issue, because that is the issue addressed by the trial court.  But we note the same failure of proof that motivated the trial court's ruling would apply to the question of whether there was any evidence Safe Security breached its duty to the plaintiff.  That is, unless there was enough evidence the intruder entered the building after 5:00 p.m., the jury could not have found Safe Security breached any duty it owed to the plaintiff.  The fact that the security guard did not adequately do his job after 5:00 p.m. would have made no difference.  See 
Taylor v. Hocker
, 101 Ill. App. 3d 639, 643-44, 428 N.E.2d 662 (1979). 

DIRECTED VERDICT -- TESTIMONY GEORGE McALISTER

Friedman's final contention is that "The trial court erred in failing to consider the testimony of security guard McAlister where Mr. McAlister's testimony established clear voluntary undertakings, breach of those undertakings, and proximate causation requiring denial of defendant's motion for a directed verdict."  

We reject Friedman's contention.  As the trial court explained, "Plaintiff's claim of error on this point ignores the facts, as well as a concession made by plaintiff's counsel during post-trial proceedings." 

Because Safe Security moved for a directed finding or judgment at the conclusion of Friedman's case, only the evidence presented by Friedman was to be considered by the trial court in ruling on Safe Security's motion for a directed finding.  See 
Century National Insurance Co. v. Tracy
, 316 Ill. App. 3d 639, 645, 737 N.E.2d 353 (2000).  

In 
Century
, we held the trial court's reliance on the testimony of an expert witness for the defense -- which had been taken out of order to accommodate the defense expert's schedule -- in granting defendants' motion for a directed finding was improper and required reversal.  
Century
, 316 Ill. App. 3d at 645.  

Our review of the records shows the trial court was correct to consider only evidence presented by Friedman on Safe Security's timely motion for a directed finding.  Accord 
Century
, 316 Ill. App. 3d at 645; 
Williams v. Chicago Osteopathic Health Systems
, 274 Ill. App. 3d 1039, 1047, 654 N.E.2d 613 (1995) ("In ruling on a motion for a directed verdict, courts must evaluate the relative strength of the nonmovant's evidence in the context of the entire record 
at the time the motion is presented
"  (Emphasis added)); 
Gillock v. City of Springfield
, 268 Ill. App. 3d 455, 456, 644 N.E.2d 831 (1994) (On defendant's motion for directed verdict, "only plaintiff's evidence may be considered, and it must be evidence actually introduced at trial, not evidence which could have been introduced").

CONCLUSION

We affirm the decision and rulings of the trial court.

Affirmed.

HALL, P.J., and CERDA, J., concur.