PATRICIA MULLOY, Adm'r of the Estate of Robert Heinbockel, Deceased, Plaintiff-Appellant, v. AMERICAN EAGLE AIRLINES, INC., Defendant-Appellee.

First District (6th Division)   No. 1—03—1940

Opinion filed June 17, 2005.

TULLY, J., dissenting.

Costello, McMahon & Burke, Ltd., of Chicago (Jim M. Webb, of counsel), for appellant.

Pretzel & Stouffer, Chtrd., of Chicago (Robert Marc Chemers and Daniel G. Wills, of counsel), for appellee.

JUSTICE McNULTY delivered the opinion of the court:

Robert Heinbockel, an airline employee working at O'Hare airport, was a pedestrian on an airport access road when he was struck by a vehicle driven by an employee of another airline, and he filed a negligence action against that airline to recover damages for the injuries he suffered. After the presentation of Heinbockel's case to a jury, the trial court directed a verdict for the defense. Patricia Mulloy, Heinbockel's successor in interest, appeals that ruling and the barring of the testimony of one of the witnesses Heinbockel sought to introduce at trial. We affirm.

Heinbockel was employed by American Airlines as a fleet service clerk at O'Hare airport; his duties in that position included the transport of passenger luggage from the airline terminal to the gates of airplanes preparing for departure. Heinbockel testified at trial that

an access route, known to airport personnel as the "depressed roadway," separated his post at one of the luggage conveyor belts from the office where printouts of flight departure gates were issued; he also explained that he routinely crossed the depressed roadway on foot.

According to his trial testimony, on October 4, 1999, Heinbockel was crossing the depressed roadway at an unmarked crosswalk protected by stop signs when he noticed a coworker, Keith Tittensor, driving a baggage cart vehicle up to the stop sign in front of him. Heinbockel stated that he approached Tittensor's vehicle from the driver's side and spoke to him through the driver's-side window. The depressed roadway consisted of two lanes, one for each direction of traffic, separated by a center dividing line, and Heinbockel testified that while he spoke to Tittensor, he remained on the same side of the center line as Tittensor's vehicle. Heinbockel was struck by a baggage cart vehicle driving in the direction opposite from Tittensor's and suffered injuries for which he sought damages in the action underlying the instant appeal. Heinbockel reported that he saw the oncoming cart only moments before being struck and could not provide detail on the manner in which the vehicle had been operated.

Heinbockel filed an action in the circuit court of Cook County against defendant American Eagle Airlines, Inc., and its employee, Shaunshell Dawkins, alleging negligence in Dawkins' driving at a speed greater than was reasonable and proper, failing to keep a proper lookout, attaching defective carts to her vehicle, and failing to properly attach the carts and further alleging negligence in American Eagle's failure to properly train and supervise Dawkins in the safe use of the vehicle and carts.

In addition to his own testimony, the evidence presented by Heinbockel at trial included the testimony of Keith Tittensor. At the time of the incident, he, like Heinbockel, was employed by American Airlines as a fleet service clerk at O'Hare airport. Tittensor testified that at the time of the accident, he was driving a baggage cart on the depressed roadway, that he stopped at a stop sign, and that he saw Heinbockel crossing the road. Tittensor anticipated that Heinbockel would continue across in front of him, but Heinbockel stopped and spoke to him through the driver's-side window for a time that Tittensor estimated to be 10 or 15 seconds.

Tittensor then saw another baggage vehicle approaching from the opposite direction. He initially testified that he saw it come to a "rolling stop" at the stop sign opposite his position, which he estimated to have been 20 to 25 feet from his own stop position; he later admitted that he was not sure if the oncoming vehicle had come to a complete

stop or not. Testimony from Tittensor and other witnesses established that the motorized driver's portion of a baggage vehicle, known as the "tug," pulled wheeled platforms, known as "dollies," which carried containers, or "pods," which could be opened, closed, locked, unlocked, and rotated on the dolly platform when unlocked.

As the oncoming vehicle passed him, Tittensor saw one of its pods spin and strike Heinbockel "without him even knowing it." Tittensor testified that the incident happened so suddenly that he had no opportunity to warn Heinbockel of the danger. He also reported that as the vehicle continued away from him, he could see one of its pods swinging as if unlocked, and it protruded beyond the edge of the dolly that supported it.

Tittensor testified that standard rules of the road were considered to be in effect on the depressed roadway. He further testified that he was sure that a speed limit applied to the area where the accident occurred, was not sure what it was, but knew that the area was a "slow area" because of the volume of activity there, and estimated that the limit was 10 to 15 miles per hour. He further stated that he did not believe that the vehicle had accelerated to a speed in excess of the limit by the time it reached him.

Tittensor testified that Heinbockel was standing on his side of the center line when the accident occurred. He was not sure where the oncoming vehicle was in relation to the center line when it approached him and did not see any part of it cross the line, but he was sure that the pod had swung and assumed that some part of the pod or dolly had crossed the line because of where Heinbockel had been standing when he was struck.

Shaunshell Dawkins, the driver of the vehicle in question, was called by Heinbockel to testify as an adverse witness. She was employed by American Eagle Airlines, which, though owned by the same holding company as Heinbockel's employer, American Airlines, is a separate, independently operating entity with its own employees. Dawkins testified that her duties for American Eagle on the date of the accident were to drive her tug vehicle to designated airplanes, hook trains of baggage dollies to her tug, drive to the American Eagle baggage belt, and transfer baggage from the pods to the belt. Dawkins explained that American Eagle did not load the pods or attach them to the dollies and that the pods and dollies were already prepared for transport by American Airlines employees when she arrived at their airplanes. Dawkins further testified that American Eagle employees were not trained in the locking of pods to dollies and that she was responsible only for attaching the dolly train to her tug, driving the tug to the American Eagle belt, and unloading the bags from the pods onto the belt.

Dawkins believed that the speed limit at the location of the accident was five miles per hour and said that she had not exceeded that limit. She initially denied driving over a bump at any time near the accident, but then conceded that, in an accident investigation conducted immediately after the incident, she had speculated that the pod attached to her vehicle came unlocked after she hit a bump. She also reported that she had not noticed anything wrong with the dollies or pods when she attached the dolly train to her tug, when she drove her vehicle to the American Eagle belt, or when she unloaded the pods. Dawkins denied driving over the center line of the roadway, said that she had seen Heinbockel and Tittensor, but had not had any idea that her vehicle had struck anyone as she drove by them.

Heinbockel also sought to introduce the testimony of Ronald Ebbole, a union safety steward for American Airlines, for the purpose of establishing that Heinbockel had not acted improperly by stopping in the roadway to talk with Tittensor and that Dawkins had operated her vehicle in an unsafe manner by not ensuring that the baggage pods stayed locked. After a review of Ebbole's training, work history and deposition testimony, and after *in camera* testimony by Ebbole in furtherance of an offer of proof made by Heinbockel's counsel, Ebbole was not permitted to testify before the jury.

At the close of the presentation of Heinbockel's case, American Eagle moved for a directed verdict, and its motion was taken under advisement. During a conference on jury instructions, the court granted the directed verdict motion, resulting in the instant appeal. Heinbockel passed away after bringing his appeal, and his estate's interests are represented in this court by Patricia Mulloy, the estate's administrator.

Mulloy contends that the trial court erred in barring the testimony of Ronald Ebbole and argues that Ebbole's testimony would have aided the jury in determining whether Dawkins was negligent in the operation of her baggage vehicle. The trial court, analyzing Ebbole's potential testimony as either an expert witness or a lay witness, ruled that such testimony was not properly admissible under either characterization. We agree.

Ebbole was an American Airlines fleet service clerk whose duties included responsibilities as a safety coordinator for the union that represented American's ramp workers. He supervised eight safety stewards who regularly checked the airline's support equipment, including equipment such as baggage tugs. Ebbole also participated in investigative hearings for examination of the circumstances surrounding employee accidents. Although he belonged to the same union that represented the American Eagle ramp workers, his safety coordinator

responsibilities did not include supervision of, advice to, or any other interaction with American Eagle employees. Ebbole never worked for American Eagle and did not know the company's training procedures or its safety policies. Ebbole had been an airline employee for more than 19 years and had driven baggage tugs "thousands" of times, but he did not have any special training regarding the operation of the tugs, dollies or pods or any special training about the depressed roadway. In a pretrial ruling on American Eagle's motion to bar Ebbole's testimony, the trial court determined that Ebbole had "no more training or experience than any other co-employee of Robert Heinbockel that would permit him to testify with his opinions as to what should or should not have been done by the defendant driver in this case." The court held that Ebbole could not offer testimony as an expert, but he would be permitted to testify to his own tug-driving experiences, including his experience that a tug driver would be able to feel the swinging of an unsecured pod behind her.

After additional testimony, however, the court modified its decision, ruling that Ebbole would not be permitted to testify as a lay witness. The court determined that the offered testimony about Ebbole's driving habits was not relevant to the issue of Dawkins' negligence, since there was no evidence that she had been driving in an unsafe manner before the accident and no evidence that the pod on her vehicle had broken free in sufficient time before striking Heinbockel to allow her any chance to avoid the accident by changing her driving methods.

■ The decision to allow or exclude testimony is within the discretion of the trial court. *Peterson Welding Supply Co. v. Cryogas Products, Inc.*, 126 Ill. App. 3d 759, 766 (1984). We believe that the trial court properly exercised its discretion in excluding Ebbole's testimony as either an expert or a lay witness.

An expert witness has knowledge beyond that of the average person due to his education, training, or experience; it is the trial court's role, in the exercise of its discretion, to rule on the qualification of a witness as an expert. *Thurmond v. Monroe*, 235 Ill. App. 3d 281, 289-90 (1992). In our view, Ebbole's deposition and *in camera* testimony conclusively established that he did not have the specialized knowledge that would have permitted the admission of his testimony as an expert: he had no special training regarding the roadway, tugs, dollies or pods and no familiarity with the training or policies of American Eagle or its employees. In light of these admissions, the trial court appropriately ruled that he was not qualified to offer an expert opinion on a standard of care applicable to Dawkins or on her departure from any such standard.

The trial court is similarly vested with the discretion to determine

the relevance and admissibility of lay testimony, and it does not err in excluding testimony that does not bear on matters at issue in the case. *Aguinaga v. City of Chicago*, 243 Ill. App. 3d 552, 567 (1993). In the instant case, testimony offered by Ebbole about his personal tug-driving habits could have served only to suggest that his own practice was the established standard of care and that a lower level of attention was a breach of an accepted standard of care.

The trial court explicitly identified the probable irrelevance of such testimony. Regarding the significance of Ebbole's own driving practices, the court recognized the lack of foundation for any suggestion that his habits reflected a more broadly accepted standard of care: "Mr. Ebbole would be able to testify as to his knowledge, not the common knowledge of all service clerks that used the depressed roadway." Moreover, even if it were presumed that Ebbole's habits established a standard of care for Dawkins, the court noted the lack of evidence that a breach of any such standard was the proximate cause of the incident: "And in view of Mr. Tittensor's testimony yesterday, this pod, or whatever you call it, spun immediately before it struck Mr. Heinbockel. So the issue of what Ms. Dawkins did up to that point or after that point is absolutely irrelevant as to safe driving practices."

We agree with the trial court's analysis of the relevance of Ebbole's testimony. We therefore conclude that the court's rulings barring the entirety of his testimony were not an abuse of discretion.

■ Mulloy further argues that the trial court's direction of a verdict in favor of the defense was error. She contends that factual disputes requiring resolution by the jury existed on the issues of Dawkins' speeding, driving over bumps and driving over the center line. We disagree.

Citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967), and *City of Mattoon v. Mentzer*, 282 Ill. App. 3d 628, 634 (1996), Mulloy bases her argument in part upon well-settled principles applicable to review of directed verdicts in Illinois: that we review such verdicts *de novo*; that a directed verdict should be granted only when all the evidence, viewed in the light most favorable to the nonmoving party, so favors the moving party that no contrary verdict could stand; and that we must consider the evidence and any inferences which may be drawn from it in the light most favorable to the nonmoving party. The basis for our departure from Mulloy's viewpoint, however, is not a disagreement regarding the validity of these general principles; we are instead unable to concur in Mulloy's application of the principles to the facts of the instant case.

Keith Tittensor testified that he was not sure of the speed limit on the depressed roadway at the location of the accident, but he estimated

that speed limit to have been approximately 10 to 15 miles per hour. He further testified that the vehicle driven by Dawkins had not been speeding.

Shaunshell Dawkins testified that the speed limit in the area was five miles per hour. She estimated her speed at the time of the accident to have been approximately the five-mile-per-hour limit; she was certain that she had not exceeded the limit.

From the foregoing testimony, Mulloy constructs the conclusion that Dawkins was speeding: she employs in this construction the Dawkins testimony that the limit was 5 miles per hour and the Tittensor testimony that the tug was moving at 10 to 15 miles per hour. At the same time, Mulloy attempts to disregard the Tittensor testimony that the limit was 10 to 15 miles per hour and the Dawkins testimony that she drove only 5 miles per hour. We find this approach to be, at best, unpersuasive. We do not believe that our mandate to review the evidence in the light most favorable to the nonmoving party further obliges us to review only that evidence which supports the view advocated by the nonmovant, or that it requires us to ignore evidence favoring the movant. Since no objective evidence corroborates either aspect of the testimony of either witness, and since both witnesses concurred in their view that Dawkins was not speeding, we conclude that the record lacks sufficient evidence to support a conclusion that Dawkins was speeding and thus lacks evidence on the speeding issue which would require reversal of the directed verdict for the defense.

Mulloy also claims that factual issues regarding Dawkins' driving over bumps and allowing parts of her vehicle to cross the center line made the direction of a verdict for the defense improper. The parties do not dispute the existence of evidence from which a jury could conclude that Dawkins did drive over a bump before her vehicle struck Heinbockel and that at least one of the pods she towed broke loose, swung free, and extended over the center line into the lane of traffic where Heinbockel stood. In our view, however, this evidence, without more, is not sufficient to support a verdict against the defendant and is accordingly insufficient to require the reversal of the directed verdict in its favor.

In a negligence action, a plaintiff must prove the existence of a duty of care, a breach of that duty, and injury proximately resulting from that breach. *Friedman v. Safe Security Services, Inc.*, 328 Ill. App. 3d 37, 47 (2002). The operator of a motor vehicle has the duty to use ordinary care to avoid injuring a pedestrian. *Neimiec v. Roels*, 244 Ill. App. 3d 275, 277 (1993). The mere fact that a pedestrian was struck by a vehicle is not, in itself, conclusive proof that the driver of the vehicle was negligent. *Woolsey v. Rupel*, 13 Ill. App. 2d 48, 54

(1957). " '[W]here the evidence presented indicates only a mere possibility that a defendant was negligent, the case must be removed from the jury's consideration' " and a directed verdict for the defense is proper. *Van Steemburg v. General Aviation, Inc.*, 243 Ill. App. 3d 299, 322 (1993), quoting *Shramek v. General Motors Corp.*, 69 Ill. App. 2d 72, 79 (1966).

In the instant case, the trial court acknowledged the evidence that Dawkins drove her vehicle over a bump, but noted that there was no evidence of where the bump was located or whether it was visible. Similarly, though Dawkins admitted that she was aware of the possibility that driving over a bump at an excessive speed could dislodge a pod from its locked position on a dolly she towed, the record did not offer any suggestion that this occurrence was anything more than a mere possibility; no evidence was offered regarding the frequency of any such event.

The trial court commented on the absence of evidence that Dawkins had any warning of what would happen:

"And in this case, we have no idea why this thing became dislodged. I don't know if it didn't have a lock. I mean, it stayed in place for a substantial period of time while she was driving it, empty and full.

She drove it from the back of the plane to the American Eagle belt, emptied all of it, as far as I can tell, and then drove about 450 feet to a stop sign without a problem, and then drove another fifteen or twenty feet, and the thing dislodged.

And I don't know why. Nobody knows why.

\* \* \*

And I have a great deal of difficulty concluding that, regardless of the reason this thing spun, Ms. Dawkins and her employer were required to anticipate it and address it.

I mean, I don't know how common an occurrence it was. I don't know why this happened.

At the American Eagle belt, she said she looked and denoted no problems.

If indeed it was a defective lock, or never locked at all, and she was just lucky until that moment that it didn't spin, what was she to have done?"

The trial court then reviewed Tittensor's testimony:

"Saw defendant coming toward them; not sure if she came to complete stop.

Defendant's speed as she passed, maybe ten to fifteen miles an hour.

Not watching for wheels; never saw anything but the pod cross over the centerline.

On cross, he then saw—the Defendant was about twenty to twenty-five feet from the witness when witness first saw her; then saw defendant move toward him, perhaps up to ten to fifteen miles an hour, not outside the speed limits.

Defendant at the sign, no pod out of place. Saw Defendant go forward. No problem seeing until it was too late.

Given the gaps that I have just outlined, I have to grant the motion for a directed verdict. I really don't want to, but I can't see any way around it.

Otherwise I'm holding the Defendant, through its employee, to a standard of strict liability that, any time this thing spins, it's American Eagle's fault."

Counsel for Heinbockel then argued that Dawkins could have avoided the accident by driving far enough to the right to ensure that a dislodged pod would not have swung over the center line into the lane of oncoming traffic. The trial court responded:

"Well, but I think we still come back to why should she have moved to the right, when she was already entirely within her lane.

And without any evidence that there was anything wrong with what she was pulling, I am holding American—if I don't grant the motion for a directed verdict, I am holding American Eagle to the standard of having to assume that every one of them is going to spin.

And I have no evidence that it happens frequently, not frequently, every time they pull a tug, when it's empty, when it's full.

And I am—I can't, I don't think, hold American Eagle to the standard that they have to assume that every time they pull these pods and dollies, they are going to spin, and so they had better drive to the far right side of the lane that they are traveling in so that it doesn't cross over the yellow line and strike something in the oncoming lane. I think that's going a step too far."

This court has held that, where a pedestrian is struck by a motor vehicle and offers evidence showing the possibility that the impact occurred within a crosswalk and suggesting that the vehicle's driver did not take sufficient steps to avoid the accident, in the absence of specific evidence of the care the driver should have taken and the means by which his actions fell below that standard, a directed verdict for the defense is proper. *Wilson v. Chicago Transit Authority*, 118 Ill. App. 3d 714, 718-19 (1983).

We believe that the import of *Neimiec*, *Woolsey*, and *Wilson* is that Heinbockel was required to present evidence which demonstrated, not merely that Dawkins failed to avoid striking him, but also that the failure was unreasonable under the circumstances. Without evidence suggesting that Dawkins could have perceived a danger to Heinbockel

and availed herself of reasonable steps to avoid it, we believe that a verdict in his favor would have been inconsistent with the applicable standard of ordinary care and would, as the trial court suggested, have been the equivalent of the imposition of strict liability upon the defendant.

We conclude that the evidence presented by Heinbockel could not have supported a verdict in his favor and that the directed verdict for the defendant was proper. We accordingly affirm the judgment of the circuit court of Cook County.

Affirmed.

O'MARA FROSSARD, J., concurs.

JUSTICE TULLY, dissenting:

I respectfully dissent. The majority holds that a directed verdict was proper because plaintiff failed to present "evidence suggesting that Dawkins could have perceived a danger to Heinbockel and availed herself of reasonable steps to avoid it." 358 Ill. App. 3d at 715-16. To the contrary, I believe plaintiff presented ample evidence of multiple breaches of the standard of care.

There can be no suggestion that Heinbockel was at fault in this accident. He was standing in a crosswalk at an intersection controlled by a stop sign when a portion of the vehicle driven by Dawkins crossed the center line and struck him. There is no suggestion that Heinbockel was not visible to Dawkins or that he moved into her lane of traffic after she attempted to drive past him. After Dawkins stopped at the stop sign, I believe she was under a clear duty to remain stopped until he left the crosswalk area or to proceed with sufficient caution that no portion of her vehicle or its load struck Heinbockel. The majority would relieve Dawkins of this obligation because the portion of her vehicle that struck Heinbockel was a pod that swung free from its dolly. I am not inclined to adopt a finding of nonliability so easily.

First, although the pods and dollies were loaded by the employees of another company, I believe that Dawkins was under an affirmative duty to inspect her vehicle for safety before driving it. At the very least, plaintiff should have been allowed to argue to the jurors that they could use their own common sense to conclude that this duty existed. I believe the majority must either concede that all matters regarding the safe operation of the baggage-handling vehicles are within the common knowledge of the jurors or reverse its holding that the testimony of an experienced tug operator and union safety coordinator constituted only impermissible lay opinion. Dawkins

admitted not only that she failed to inspect the dollies and pods before attaching them to her tug but that defendant never provided her with training on how to do so.

Second, although she denied doing so at trial, Dawkins admitted during an accident investigation that she drove over a bump sufficient to cause a pod to swing off its dolly. I believe that this constitutes a clear deviation of the standard of care. The majority discounts this evidence because plaintiff did not identify the location of the bump. I fail to perceive how the location of the bump is relevant. Dawkins' admission, an admission by an admitted agent of the defendant, is sufficient to establish that she, in fact, drove over a bump.

Third, although the evidence is not as strong, I believe that Dawkins violated the applicable standard of care by failing to observe that the pod had swung loose while she was driving the luggage vehicle. As with the issue of inspection, I believe that we must either assume that this is a matter within common knowledge or reverse based on the trial court's failure to allow expert testimony on whether a baggage-vehicle driver could be expected to observe using mirrors or through feel that a pod was swinging free on its dolly.

In conclusion, I believe that plaintiff presented ample evidence of as many as three separate violations of the standard of care. Although the jury might not have made the same inferences that I have, it was that body, and not the trial court, that should have weighed the evidence supporting plaintiff's claim. Finally, lest plaintiff be criticized for failing to identify which of the three violations of the duty of care was violated, I believe application of the doctrine of *res ipsa loquitur* would be appropriate. The pod swung loose because Dawkins violated at least one of these standards, and at the time of the allegedly negligent act, *i.e.*, the failure to inspect, driving over a bump, or failing to observe the loose pod, the instrumentality, the baggage vehicle consisting of tug, dollies and pods, was exclusively in her control. I would reverse the judgment of the trial court and remand this matter for further proceedings.