**FIRST DIVISION**
March 3, 2008

No. 1-05-1700

| | | |
|---|---|---|
| WILLIAM OLDENSTEDT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| MARSHALL ERDMAN AND ASSOCIATES, INC. | ) | |
| | ) | No. 00 l 1933 |
| Defendant-Appellant, | ) | |
| | ) | |
| | ) | |
| | ) | The Honorable |
| (Brongiel Plumbing, | ) | James Varga, |
| | ) | Judge Presiding. |
| Third-Party Defendant-Appellee). | ) | |

JUSTICE GARCIA delivered the opinion of the court.

The plaintiff, William Oldenstedt, sued the defendant, Marshall Erdman & Associates, Inc. (Erdman), after he injured his back at a construction site. At the time of the injury, Oldenstedt was employed by third-party defendant Brongiel Plumbing (Brongiel), with which Erdman had subcontracted. The trial court granted Brongiel's motion for a directed verdict and the jury subsequently returned a verdict in Oldenstedt's favor. On appeal, Erdman contends it is entitled to a new trial because Oldenstedt's rebuttal closing argument was "slanderous and grossly prejudicial," the trial court erroneously instructed the jury, and the trial court erroneously refused Erdman's special

interrogatories.  Erdman also contends the trial court erred in granting Brongiel's motion for a direct verdict.

BACKGROUND

Erdman is a construction company specializing in the designing and building of medical facilities.  In 1996, Erdman was hired as the general contractor in a small construction project underway at Little Company of Mary Affiliated Services, Inc. (Little Company), in Evergreen Park.  The design/build contract drafted by Erdman and entered into by Erdman and Little Company (the Erdman-Little Company contract) contained the following provisions.

**"ARTICLE 20**

Subcontractors

*** [Erdman] shall be responsible to [Little Company] for all acts and omissions of subcontractors of all tiers and their employees. [Erdman] shall also be responsible for the construction of [Erdman's] work and the work of all subcontractors including, but not limited to, all suppliers and materialmen.

**ARTICLE 21**

Covenants of Designer/Builder

21.1 [Erdman] shall supervise and direct

2

the Work, using his best skill and attention. [Erdman] shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract Documents. ***

* * *

21.7 [Erdman] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Project.

* * *

21.9 [Erdman] shall erect and maintain, as required by existing conditions and performance of the Contract Documents, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating, safety regulations and notifying owners and users of adjacent utilities."

Erdman subcontracted with Brongiel to provide plumbing services on the Little Company project.  The subcontract between Erdman and Brongiel provided as follows.

"1. [Brongiel] agrees to furnish and

3

provide all work, labor, materials, supervision and whatsoever else may be required to fully do, perform and complete, and will complete without any exceptions (unless specifically noted in this Subcontract), in a neat, first-class, good and workmanlike manner, the following described work:

Furnish and install a complete plumbing system ***.

* * *

18. Safety: [Brongiel] agrees to observe and comply with all provisions and requirements of the Occupational Safety and Health Act of 1970 in performance of the work under this Subcontract, to assume all responsibilities of [Erdman] with respect to the work under this Subcontract and to indemnify and hold harmless [Erdman] from all penalties, damages or other loss resulting from failure of [Brongiel] in performance of this Subcontract to comply with the Occupational Safety and Health Act of 1970 and the responsibilities with respect to such performance."

4

William Oldenstedt was a plumbing foreman for Brongiel at the Little Company project. On July 22, 1996, Oldenstedt injured his back unloading a toilet from a rolling Dumpster. Oldenstedt, a smoker who was overweight and suffered from other health conditions, was eventually referred to a neurosurgeon.

Oldenstedt presented with preexisting degenerative disc disease and was diagnosed with L4-L5 disc herniation with intractable right L5 radiculopathy. On March 17, 1997, Oldenstedt underwent surgery at the L4-L5 site. The surgery, however, only temporarily relieved his pain.

On June 24, 1999, Oldenstedt and his wife filed case number 99 L 4642, a 12-count complaint against Erdman and Little Company alleging negligence and loss of consortium. That suit was dismissed, and, on February 17, 2000, Oldenstedt and his wife filed case number 00 L 1933 against Erdman and Little Company. Mrs. Oldenstedt later dropped her loss of consortium claims, and Oldenstedt and Little Company settled. Erdman filed a third-party complaint for contribution against Brongiel.

On November 22, 2004, Oldenstedt filed a two-count second-amended complaint. He subsequently filed a one-count third-amended complaint alleging construction negligence against Erdman.

A jury trial commenced on December 1, 2004. William Oldenstedt testified that shortly after he arrived at the Little Company project on July 22, 1996, a Brongiel truck arrived with

plumbing fixtures, including sinks and toilets. The driver of the truck helped Oldenstedt unload the fixtures onto the parking lot.

Edward "Butch" Colbert, Erdman's superintendent at the project, told Oldenstedt to move the fixtures to a second-floor storage room. Oldenstedt asked the Brongiel driver whether he had a platform or device Oldenstedt could use to transport the fixtures. The driver did not. Oldenstedt then asked Colbert whether he had an appropriate device. Colbert told Oldenstedt to use one of the rolling Dumpsters at the site that belonged to Little Company. Unbeknownst to Oldenstedt, there were at least two dollies at the site.

Oldenstedt did as Colbert instructed. While he was unloading a 50-pound handicap-accessible toilet from the Dumpster, he felt his feet slipping. Oldenstedt fell head first into the Dumpster and felt pain in his back and leg. When he was able to pull himself out of the Dumpster, Oldenstedt noticed a substance on the floor that looked like sand or grit.

It was the job of Steven Bunge, an Erdman project manager, to ensure quality and safety at the jobsite. Bunge was questioned about the Erdman-Little Company contract, including those portions stated above. Erdman also had its own safety rules in effect in 1996, and each subcontractor was required to have in place its own safety policies and procedures. Bunge also testified that in his education, training, and experience, each

subcontractor was primarily responsible for the safety of its employees. Erdman, however, had a responsibility to keep the jobsite clean and free of debris.

According to Bunge, Butch Colbert, as superintendent, was responsible for supervising, directing, and otherwise controlling the subcontractors' work. Colbert did not dictate the "means or methods" of that work, but had the right to stop the work if an unsafe practice was occurring. Colbert was also required to conduct daily safety inspections at the site and document the inspection by filling out a form.

John Hetland, an Erdman senior project manager, also testified. According to Hetland, a subcontractor foreman was responsible for ensuring his or her own safety, as well as the safety of his or her crew, and was responsible for providing safe tools. Hetland was familiar with the Erdman safety rules and was aware that Erdman, through its superintendent, was to conduct regular safety meetings with subcontractors on its jobsites. Hetland additionally testified it was Colbert's duty as project superintendent to keep a record of all safety meetings and to document all safety inspections. Hetland, however, did not know whether any such meetings or inspections took place at the Little Company project and did not know where any such documentation was or why it was not tendered to Oldenstedt's attorney. According to Hetland, it would be contrary to Erdman's policies to discard documents that might be relevant to a lawsuit.

7

Oldenstedt's attorney also questioned Ronald Wanke, Erdman's safety director, about the missing safety documentation. Wanke testified he did not know when any forms related to the Little Company project were disposed of, including whether they were disposed of before or after Oldenstedt filed suit. Wanke also explained Erdman adhered to a three-year document retention policy. Although Wanke did not know when Oldenstedt's suit was filed, he did not dispute the representation made by Erdman's attorney that suit was filed in 2000.

Butch Colbert testified that two dollies were on site at the Little Company project and that it was common practice in the construction industry for the employee of a subcontractor to use tools belonging to the general contractor. Colbert also testified he had no recollection of telling a Brongiel employee to use a Dumpster to move a toilet.

Peter Cucuz, a liability expert retained by Oldenstedt, testified that in his opinion, to a reasonable degree of certainty within the field of construction, the Erdman-Little Company contract indicated Erdman was in control of the project. Timothy Galarnyk, a liability expert retained by the defendant, opined it was Oldenstedt's responsibility as Brongiel's foreman to provide the devices to transport the plumbing fixtures and that Oldenstedt and Oldenstedt alone was responsible for his injuries.

Regarding Brongiel's liability on Erdman's counterclaim,

Ronald Wanke testified he did not see any documentation indicating Brongiel did anything wrong. Peter Cucuz additionally opined that, based on all the documents he reviewed in the case, Brongiel "did absolutely nothing wrong." Timothy Galarnyk, like Cucuz, testified Brongiel "did absolutely nothing wrong."

After the completion of the evidence, the trial court addressed Brongiel's motion for a directed verdict on Erdman's counterclaim. The court asked any party to "point to some evidence, because [it did not] see any [supporting the counterclaim]." While counsel for Erdman objected to the granting of a directed verdict for Brongiel, she did not argue that sufficient evidence had been presented. Rather, she argued that, "if there's no negligence on behalf of Brongiel Plumbing ***, we also would have no negligence in this matter." The trial court granted the motion.

The jury instruction conference next took place, and the parties gave their closing arguments. After deliberating, the jury returned a verdict in favor of Oldenstedt in the amount of $1,202,093.60, but reduced the award by 35% to $781,360.84 due to Oldenstedt's negligence. The trial court entered judgment on the verdict, but subsequently reduced the award by $10,000, the amount of the settlement between Oldenstedt and Little Company. Erdman's motion for a new trial was denied, and this timely appeal followed.

ANALYSIS

## I.  Rebuttal Closing Argument

Erdman contends Oldenstedt's rebuttal closing argument amounted to a "diatribe" that denied it a fair trial.

In his opening closing argument, counsel for Oldenstedt argued that Oldenstedt was a hard-working man who was asking for a "fair shake."  Counsel argued the evidence demonstrated Erdman had contractual control of the work and that Butch Colbert instructed Oldenstedt to move the plumbing fixtures with the Dumpster.  Counsel also argued that Oldenstedt was credible and Erdman's evidence was not.

In her closing argument, counsel for Erdman went beyond merely arguing that Oldenstedt was not credible; she repeatedly urged that Oldenstedt "lied," including about how the accident occurred.  Counsel also argued that Oldenstedt was more than 50% at fault.  Counsel also sought to explain Erdman's lack of safety documentation for the date of claimed accident:

> "Now, why don't they have the document?  Because this happened in 1996.  And, first of all, they were never notified of the incident.  Second of all, there was no lawsuit filed until 1999, which was more than three years after they would have been notified; and it was their policy to get rid of documents."

In rebuttal, Oldenstedt's attorney turned the claim of "liar" on Erdman.

"Who's lying?  Let me tell you who's lying.  Remember she just told you that this lawsuit was filed more than three years after this happened?  That's a lie.  Here it is: June 24th, 1999, less than three years.  And why does that matter?  Because they were supposed to keep their records three years.

So you know what happened?  They got sued.  Picture this: Marshall Erdman & Associates, Incorporated.  Picture the boardroom at this corporation, the CEO, the CFO, the CPO, the CEA, whatever the heck they are.  And somebody says, 'What's on the agenda?'

'I've got something on the agenda.

'What is it?

'We got sued by this [man] in Chicago.

'What happened?

'Well, back in '96, this guy got hurt and we were hoping it would go away and it didn't.  He sued us.

'Well, what do we do?  What do we know about it?

'Well, we've got the incident report that Butch filled out at the time. But you know what we don't have? We don't have any of the forms, the safety forms we're supposed to have. What are we going to do?

'Well, we've got two choices. One, we can step up and do the right thing. Or two, we can try to crush this guy.'

So what does the corporation decide to do? Crush him. Step one, throw out all the documents. Throw them out because then they wouldn't be able to show--And then we'll attack him and say, We don't have any record it happened.

Number two, let's hire--you know, the law firm this guy hired is just this one guy, Wadington. Let's hire a firm in Chicago with about nine names and destroy this guy because that's what corporations try to do. And that's what happened here. Okay? Let's hire a 10,000-dollar expert, God know how many other thousand-dollar experts. And you know what they forgot? Here's what they forgot: They underestimated the intelligence of a Cook County jury. Okay?

12

I'm not attacking Ms. Goggin-Ward [Erdman's counsel] personally. She's just the messenger. But the message is insidious: A corporation trying to crush that guy, and it only happens if you let them. Okay. If they didn't know it happened, do you think they would have spent 10,000 bucks on Kanter and God knows how may thousand bucks on Zelby because if it didn't happen, you never get to damages. Make sense?

* * *

Somebody is lying here. Here's the document that shows who's lying. They got sued within the time they're supposed to have the documents: June 24th, 1999. Not what she told you but less than three years. And so what do corporations do? They attack him. They try to crush him. They try to make him a liar. It didn't work. He didn't lie once.

* * *

Who's lying? You want to call my guy a liar, I'm coming after you. You, Corporation, in Cook County want to call a working man a liar, I'm coming after them because Chicago is a working man's town. And

13

corporations can't be allowed to get by with this. And only, only if your verdict is fully just will corporations like this learn that you can't do that in Chicago. You can't do that to guys like this. They live their whole life, they ask nothing of the system. And the one time they do, the corporate boardroom decides to smash them.

Please hear the truth and don't let them do that. Here's the truth. Here's the lie (indicating).

Thank you."

Because Erdman's claim of error regarding the rebuttal argument is based on the absence of supporting record evidence and the prejudicial nature of the argument itself, we address its claim of error in two parts.

*A. No Evidentiary Support*

First, Erdman argues that Oldenstedt's counsel improperly argued in rebuttal that the lawsuit had been filed on June 24, 1999, thus placing Erdman on notice within its three-year document retention period for safety forms based on the date of the claimed accident of July 22, 1996. In its main brief, Erdman states, "However, it is the date of *service* *** that establishes Erdman's knowledge of this lawsuit, and there is no record evidence regarding *** when [] Erdman was served." (Emphasis in

14

original.)

To preserve its claim of error that there is no record evidence to establish the date Erdman became aware of the lawsuit to trigger the retention of its safety documents, trial counsel for Erdman should have objected. See <u>Bulleri v. Chicago Transit Authority</u>, 41 Ill. App. 2d 95, 104, 190 N.E.2d 476 (1963) (finding it improper for counsel to argue to the jury facts in his own knowledge, not testified to by any witness). Because no objection was made, the claim is waived. <u>Simmons v. University of Chicago Hospitals & Clinics</u>, 162 Ill. 2d 1, 12, 642 N.E.2d 107 (1994).

However, our resolution of this claim of error is not based solely on waiver. We note that it was Erdman's trial counsel that first mentioned the date of 1999 during its closing argument: "[T]here was no lawsuit filed until 1999, which was more than three years after they would have been notified; and it was [Erdman's] policy to get rid of documents." To rebut Erdman's claim that the filing of the lawsuit was more than three years after Oldenstedt's injury, Oldenstedt's counsel argued that the accident happened on July 22, 1996, and that the a complaint was filed against Erdman on June 24, 1999. (The only one in the record that was filed in 1999.)

Even in the absence of waiver, we would find no reversible error. To the extent Erdman argued that the filing of the 1999 lawsuit was more than three years after the accident, we reject

any claim of error based on an Oldenstedt's argument in rebuttal that directly challenged the argument advanced by Erdman. "Our decisions have repeatedly held that a defense attorney cannot provoke a reply to his own improper argument and then claim error." Tzystuck v. Chicago Transit Authority, 124 Ill. 2d 226, 246, 529 N.E.2d 525 (1988).

### B. Prejudicial Nature

The second part of Erdman's claim of error is based on the prejudicial nature of the rebuttal argument. We find this more substantial.

Erdman complains that Oldenstedt's counsel "explicitly accus[ed] Erdman of deliberately discarding the safety documentation in order to 'crush' and 'smash' plaintiff. Plaintiff did this by describing an illusory 'meeting' of Erdman's directors where they chose to throw out the safety documentation and attack plaintiff for even filing suit." Erdman further contends that Oldenstedt's argument, that a Cook County jury would not be so easily swayed by the destruction of documents that would have supported Oldenstedt's claim that he was injured on the job, amounted to an effort "to whip the jury into a frenzy, to incite the jury into a blind rage, all so that the jury, in an act of vengeance, would convict Erdman." According to Erdman, the incitement to a frenzy also was the product of Oldenstedt's argument that Erdman "underestimated the intelligence of a Cook County jury," that "Chicago is a working

16

man's town," that "corporations can't be allowed to get by with this.  And only, only if your verdict is fully just will corporations like this learn that you can't do that in Chicago," and "[y]ou can't do that to guys like this."

Because Erdman's trial counsel did not object, Erdman asserts the plain error exception to the waiver rule.

Oldenstedt, in addition to waiver, contends his rebuttal argument "merely responded to Erdman's counsel's slanderous attack, making fair comment upon the actual evidence and testimony to make it clear that the only party that was not being forthcoming with the jury was Erdman."  Oldenstedt contends in his brief that on "no less than nine separate occasions" Erdman either directly or indirectly called Oldenstedt a liar.  Some examples include:

> "[T]he plaintiff, William Oldenst[e]dt, has not told the truth about what he did or did not do on July 22 of 1996 at Little Company of Mary Hospital.  Nor has be told the truth about any back condition or conditions he may or may not have sustained on, before, during, or after that date."
> "[T]he plaintiff, William Oldenst[e]dt, is not to be believed."
> "[W]e know the plaintiff lied about how he testified this accident happened.  We just

17

know that."

"[T]he accident plaintiff describes was physically and scientifically impossible to have happened that way."

"[P]laintiff lied.  Pure and simple, he faked it."

A counsel's failure to object to claimed prejudicial comments during closing argument will generally waive the issue for review.  Simmons, 162 Ill. 2d at 12.  However, in some cases, a reviewing court may find plain error sufficient to overcome the waiver bar.  In the context of closing arguments, our supreme court has explained:

"If prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved thereon."  Belfield v. Coop, 8 Ill. 2d 293, 313, 134 N.E.2d 249 (1956).

The supreme court has instructed reviewing courts, when applying the Belfield test, to "strictly apply the waiver doctrine unless the prejudicial error involves flagrant

18

misconduct or behavior so inflammatory that the jury verdict is a product of biased passion, rather than an impartial consideration of the evidence." Gillespie v. Chrysler Motors Corp., 135 Ill. 2d 363, 375-76, 553 N.E.2d 291 (1990).

On the record before us, we need not decide whether Oldenstedt's rebuttal argument was within the proper bounds of a response to the closing argument made by Erdman. It is clear on the record that this was a contentious trial, with each party challenging the veracity of the other. Such matters, where neither party is blameless for the escalating nature of the attacks, are best left to the trial judge to address. See Torrez v. Raag, 43 Ill. App. 3d 779, 357 N.E.2d 632 (1976) (no abuse of discretion found in trial court granting new trial because trial court is in a better position to determine the prejudicial effect of defense counsel's remarks on the jury).

Of course, the trial judge, except in the most rare of cases, must be presented with an objection in order to intercede. As Erdman did not object, we need only decide whether Oldenstedt's rebuttal argument involved such flagrant misconduct or inflammatory behavior that the waiver bar is overcome. In order to so find, we must conclude that the complained-of portions of Oldenstedt's rebuttal argument resulted in such prejudice to Erdman that it was denied "a fair trial and substantially impaired the integrity of the judicial process itself." (Emphasis in original.) Gillespie, 135 Ill. 2d at 377.

19

Thus, to invoke plain error, it is not enough for Erdman to claim that Oldenstedt's story of an Erdman board meeting where Erdman executives opted to "crush" Oldenstedt by "throw[ing] out all the documents" was not based on the evidence at trial, or that the rebuttal argument "created evidence out of whole cloth." Rather, we must determine whether the rebuttal argument undermined the judicial process itself. We must examine the rebuttal argument in context, keeping in mind the nature of the argument put forth by Erdman. See People v. Wheeler, 226 Ill. 2d 92, 122, 871 N.E.2d 728 (2007).

The record suggests that Oldenstedt's reference to a mock board meeting at Erdman was made in response to Erdman's own contentions that Oldenstedt was a liar and Erdman's representation that it had no knowledge of the accident until after the safety documents were disposed of. While Erdman maintains that the jury might have been misled by the rebuttal argument into believing that such a board meeting actually took place, we do not agree. As Erdman rightly contends, the record is barren of any evidence that such a corporate meeting took place; the absence of any such evidence persuades us that the jury was not so easily swayed to believe that Oldenstedt's rebuttal argument was meant to suggest that such a meeting actually occurred. See Pomrenke v. Betzelberger, 41 Ill. App. 2d 307, 316, 190 N.E.2d 522 (1963) ("we do not believe that our juries should be regarded as a class of persons easily deceived

20

or misled").

In addition, Oldenstedt's argument regarding the mock meeting was prefaced with "Picture this," making clear that what followed was a response to Erdman's contention that no accident took place, that Oldenstedt's claim of injury was false, that he lied. It was Oldenstedt's contention that the safety records, no longer in existence, would have supported his claim. It is apparent that Oldenstedt's argument regarding the mock Erdman meeting where the destruction of the safety records was discussed was the flip side of Erdman's argument that Oldenstedt lied about the accident itself. See Lewis v. Cotton Belt Route-Saint Louis Southwestern Ry. Co., 217 Ill. App. 3d 94, 122, 576 N.E.2d 918 (1991) (argument "that the jury should 'stand up and be counted' and 'not to let the [defendant and its expert] get away with things that have been happening' [was found] to be fair response on rebuttal to defendant's argument in support of its defense of physical impossibility and of plaintiff's credibility with regard to his alleged injury. Therefore, these comments were also based on the evidence ***").

We are aware of no authority that compels Oldenstedt, before responding to Erdman's claim that Oldenstedt was a liar, to limit himself to the record of "supporting evidence [of such] a 'meeting' of Erdman's board of directors in which plaintiff's lawsuit was discussed" (emphasis omitted) before he is permitted to respond in kind. While two improper arguments may not make a

right result, we cannot say that Oldenstedt's argument would have been made had Erdman not challenged Oldenstedt's testimony in the manner in which it did.  See Moore v. Centreville Township Hospital, 246 Ill. App. 3d 579, 590, 616 N.E.2d 1321 (1993), rev'd on other grounds, 158 Ill. 2d 543, 634 N.E.2d 1102 (1994) ("Although two improper arguments do not a make a right result [citation], a party may not claim error based on invited remarks").

We do not suggest, however, that had Oldenstedt's rebuttal argument been challenged by a timely objection, such an objection should have been overruled.  See, e.g., Simmons, 162 Ill. 2d at 12-13.  The trial judge was in a better position to determine that question.  See Torrez v. Raag, 43 Ill. App. 3d 779, 783, 357 N.E.2d 632 (1976) (trial court in a superior position to gauge prejudicial effect of an improper closing argument); Moore, 246 Ill. App. 3d at 590 (new trial motion claiming plain error is within trial court's discretion, as it is in the best position to assess prejudice).

We only decide that, on the record before us, Erdman's claim of error based on Oldenstedt's rebuttal argument does not rise to plain error.  See Holder v. Caselton, 275 Ill. App. 3d 950, 657 N.E.2d 680 (1995) ("hometown" doctor theme in opening, examination of witness, and closing argument did not meet stringent standard of plain error to warrant reversal); Bruske v. Arnold, 44 Ill. 2d 132, 137, 254 N.E.2d 453 (1969) (statements

22

made in closing were improper, but did not rise to level of prejudice contemplated in Belfield).  As our supreme court made clear in Gillespie, the cases in which it applied the Belfield standard and granted a new trial "involved blatant mischaracterizations of fact, character assassination or base appeals to emotion and prejudice," resulting in a deterioration of the judicial process.  Gillespie, 135 Ill. 2d at 377.  This is not such a case.[1]

II.  Jury Instructions/Special Interrogatories

Erdman next contends the trial court improperly instructed the jury and improperly refused two special interrogatories.

A.  *Jury Instructions*

Whether to give or deny a particular jury instruction is within the discretion of the trial court.  Dillon v. Evanston Hospital, 199 Ill. 2d 483, 505, 771 N.E.2d 357 (2002).  We review the trial court's exercise of discretion to determine "whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the

---

[1] We also note that the jury found Oldenstedt 35% negligent for his injuries, supporting that the jury decided this case on the evidence, contrary to Erdman's claim that the jury was incited into a "blind rage" to seek "vengeance" by Oldenstedt's rebuttal argument.

law." Dillon, 199 Ill. 2d at 505.

At the jury instruction conference, the parties disputed the applicability of the so-called "construction negligence instructions" (Illinois Pattern Jury Instructions, Civil, Nos. 55.01, 55.02, 55.03 (2006) (hereinafter IPI Civil (2006)). Oldenstedt's attorney advocated their use, while Erdman's counsel argued the general premises liability instruction (IPI Civil (2006) No. 120.09) was applicable. Erdman's attorney eventually informed the court that she was objecting "to any of the 55 instructions being used," but because the trial court had ruled against her, the parties had "reached [an] agreement *** to [the] language," which slightly modified the IPI language.

Accordingly, the court instructed the jury as follows:

> "A contractor who entrusts work to a
> subcontractor can be liable for injuries
> resulting from the work if the contractor
> retained control over the methods and/or
> means of the work and the injuries were
> proximately caused by the contractor's
> failure to exercise that control with
> ordinary care to ensure workers' safety."

See IPI Civil (2006) No. 55.01.

> "A party who has retained control over
> the methods and/or means of the work has a
> duty to exercise that control with ordinary

24

care to ensure workers' safety." See IPI Civil (2006) No. 55.02.

"Plaintiff William Oldenstedt seeks to recover damages from defendant Marshall Erdman & Associates. In order to recover damages, the plaintiff has the burden of proving (1), the defendant retained control over the methods and/or means of the work; (2), the defendant acted or failed to act in one or more of the following ways: [(A)] Failed to provide Bill Oldenst[e]dt with a two-wheeled cart/dolly to move the plumbing fixtures. (B), provided Bill Oldenst[e]dt with a [D]umpster to move the plumbing fixtures. (C), failed to inspect the storage room before directing Bill Oldenst[e]dt to place the fixtures there. (D), failed to inform Bill Oldenst[e]dt [that] there were two-wheeled cart/dollies on the job site. (E), failed to remove the waste or debris from the storage room floor. (F), failed to provide the proper lighting in the storage room. (G), failed to provide an Erdman carpenter or laborer to assist Bill Oldenst[e]dt in moving the fixtures and, in

25

> so acting or failing to act, was negligent in
> the manner which it exercised or failed to
> exercise its control to ensure workers'
> safety. (3), plaintiff Bill Oldenst[e]dt was
> injured. (4), the defendant's negligence was
> a proximate cause of plaintiff's injuries."

See IPI Civil (2006) No. 55.03.

Erdman argues the language of the Erdman-Little Company contract was insufficient as a matter of law to support a finding that Erdman retained control over the method and means of the work of the project. Erdman argues the jury should have been instructed about the contract's insufficiency.

This contention fails. First, Erdman, by failing to tender alternative instructions, has waived this issue for review. Auton v. Logan Landfill, Inc., 105 Ill. 2d 537, 549, 475 N.E.2d 817 (1984).

Second, any error that may have occurred was invited by Erdman. After the trial court determined the IPI, Civil, 55 series (IPI Civil (2006) No. 55.00 et seq.) were applicable in this case, Erdman's attorney informed the court she "reached agreement" with Oldenstedt's attorney regarding the language to be used. Because Erdman's attorney acquiesced to the language of the instructions, Erdman cannot complain of it on appeal. "Simply stated," the doctrine of invited error prohibits a party from complaining of an error on appeal "which that party induced

26

the court to make or to which that party consented." In re Detention of Swope, 213 Ill. 2d 210, 217, 821 N.E.2d 283 (2004).

Finally, it bears noting that one of the complained-of instructions, IPI Civil (2006) No. 55.03, was submitted to the jury in a manner that undoubtably favored Erdman's defense. The instruction given omitted the word "or" between the allegations contained in subparagraphs (A) through (G). Thus, the jury was instructed that it was required to find that Oldenstedt met his burden of proof as to all of the allegations contained in those subparagraphs, rather than to only one of them.

In sum, we find no reversible error occurred where trial counsel not only failed to proffer alternative instructions at trial, but where a given instruction, presumably in accordance with the agreement reached by counsel, substantially favored the defense.

## B. Special Interrogatories

Erdman next contends the trial court erred in rejecting two of its special interrogatories regarding Erdman's retention of control. The interrogatories, initially offered, stated:

> "[1.] Do you find that Marshall Erdman & Associates retained control over the means, methods, and safety of Brongiel Plumbing's work?
>
> [2.] Do you find that William Oldenstedt's injuries were proximately caused

by Marshall Erdman & Associates' failure to exercise control over the means, methods[,] and safety of Brongiel Plumbing's work with ordinary care?"

The trial court refused the interrogatories because it found the wording of the interrogatories created confusion because the interrogatories used the word "safety" while the IPI, Civil, 55 series instructions to be given omitted that word and where the interrogatories referred to Brongiel rather than Oldenstedt.  The following morning, Erdman's attorney again submitted special interrogatories.[2]  Oldenstedt's attorney objected to the interrogatories again because of their wording.  Counsel for Erdman stated, "I understand the concern from the plaintiff's counsel.  I think this could, in fact, be reworded, however."  The court explained:

"You know, I need a case on this.  I warned you about special interrogatories. ***  And, you know, if you're going to ask to reamend, I don't know how many times I can keep reamending.  You just reamended last night.  You gave them to me late.  Go ahead and make your record.  I mean, there's some

_____

[2] It is unclear how the special interrogatories read when resubmitted.

point where I've got to say, 'You've had a

couple bites out of the apple; you're done.

You're late.' But go ahead. I may let you

do it, okay?"

The revised special interrogatories were submitted and were again rejected by the court.

As Erdman points out, "a trial court has no discretion to reject a special interrogatory that is proper in form." Thomas v. Johnson Controls, Inc., 344 Ill. App. 3d 1026, 1033, 801 N.E.2d 90 (2003), citing 735 ILCS 5/2-1108 (West 2002). The trial court does, however, retain a traditional right of discretionary control over its own docket. See, e.g., People ex rel. Devine v. Sharkey, 221 Ill. 2d 613, 622, 852 N.E.2d 804 (2006). Despite being given numerous opportunities to do so, counsel admittedly failed, on numerous occasions, to present interrogatories that were, according to the trial court, in proper form. Furthermore, absent a showing on the record before us that the interrogatories were in proper form, we can find no reversible error occurred.

### III. Directed Verdict for Brongiel

Erdman's final contention is that the trial court erred by directing a verdict in Brongiel's favor on its counterclaim.

A directed verdict should be granted only where all of the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that

no contrary verdict can stand.  Mulloy v. American Eagle Airlines, Inc., 358 Ill. App. 3d 706, 712, 832 N.E.2d 205 (2005), citing Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).  A directed verdict should not be granted where " 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' "  York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178, 854 N.E.2d 635 (2006), quoting Pasquale v. Speed Products Engineering, 166 Ill. 2d 337, 351, 654 N.E.2d 1365 (1995).

Our standard of review is de novo.  Bermudez v. Martinez Trucking, 343 Ill. App. 3d 25, 29, 796 N.E.2d 1074 (2003).

In support of its counterclaim, Erdman points to Oldenstedt's testimony indicating the Brongiel truck driver delivered the plumbing fixtures, but did not supply any kind of device to transport them.  Erdman contends this testimony combined with Brongiel's contractual duty to furnish and provide all work, labor, materials, and supervision "constitutes sufficient evidence of Brongiel's negligence to have survived a motion for a directed verdict."  Erdman, however, did not raise this argument at trial when the court specifically asked Erdman's attorney to "point to some evidence" to support its contribution claim.

More to the point, while this argument addresses duty and breach, to avoid a directed verdict, the element of proximate cause must also be established in a prima facie case.  Bermudez,

30

343 Ill. App. 3d at 29. "While proximate cause is generally a question of fact, it becomes a question of law when the facts alleged indicate that a party would never be entitled to recover. [Citations.] Accordingly, if the plaintiff fails to establish the element of proximate cause, he has not sustained his burden of making a prima facie case and a directed verdict is proper." Bermudez, 343 Ill. App. 3d at 29-30.

While Erdman does not specifically address the issue of proximate cause in its brief, Erdman's claim of "sufficient evidence" is founded on Oldenstedt's testimony that Brongiel did not provide a moving device when it dropped off the plumbing fixtures. That testimony is, at best, circumstantial evidence from which negligence may be inferred. "[C]ircumstantial evidence is sufficient to establish proximate cause *** as long as the inference in question may reasonably be drawn from the evidence." Nowak v. Coghill, 296 Ill. App. 3d 886, 896, 695 N.E.2d 532 (1998).

Erdman's contention, that the failure to provide a "dolly for [Oldenstedt] to use to move the toilets from the parking lot into the building" supports an inference of negligence that the jury may draw to hold Brongiel liable on the counterclaim, fails to consider that before a trier of fact may be allowed to draw an inference of negligence based upon circumstantial evidence, "the circumstances [must be] of a nature and so related to each other that it is the only conclusion that can be drawn therefrom, and

31

mere conjecture, guess, or suspicion is insufficient." Coulson v. Discerns, 329 Ill. App. 28, 32, 66 N.E.2d 728 (1946).

We do not find an inference of negligence to be the only conclusion that can be drawn from Oldenstedt's testimony regarding Brongiel's failure to leave a dolly to allow the jury to render a verdict on Erdman's counterclaim. Erdman does not persuade us that it was more probable that Brongiel's failure to leave a dolly was a proximate cause of Oldenstedt's injuries than that it was not a proximate cause. See McInturff v. Chicago Title & Trust Co., 102 Ill. App. 2d 39, 53, 243 N.E.2d 657 (1968), quoting Vance v. Picken, 93 Ill. App. 2d 294, 298, 235 N.E.2d 266 (1968), quoting Celner v. Prather, 301 Ill. App. 244, 227, 22 N.E.2d 347 (1939) (" ' "It cannot be said one fact can be inferred, when the existence of another inconsistent fact can be drawn with equal certainty" ' "). We do not agree that an inference of negligence may reasonably be drawn from Oldenstedt's testimony, even in the face of Brongiel's contractual duty. We do not agree that Oldenstedt's testimony is the sort of affirmative and positive evidence that would justify a jury to conclude that Brongiel was negligent in that regard. See McInturff, 102 Ill. App. 2d at 48 (plaintiff's burden to show "affirmatively and positively" that claimed negligence was proximate cause of injury).

In fact, the evidence established that a dolly was present at the shipping area when the plumbing fixtures were delivered.

Uncontradicted testimony, however, was presented that Erdman's project superintendent, Colbert, directed Oldenstedt to use the Dumpster to transport the fixtures. In the face of this evidence, no reasonable certainty exists that Brongiel's failure to provide a dolly was a legal cause of Oldenstedt's injury. See Kimbrough v. Jewel Cos., 92 Ill. App. 3d 813, 817, 416 N.E.2d 328 (1981) ("No liability can exist unless the defendant's alleged negligence is the legal cause of the plaintiff's injury"); McInturff, 102 Ill. App. 2d at 48 (negligence involved in the violation of a duty imposed by an ordinance does not impose liability unless it proximately causes the injury). In fact, the only affirmative and positive evidence on the issue presented by the counterclaim came from Ronald Wanke, Peter Cucuz, and Timothy Galarnyk and that evidence was that Brongiel did nothing wrong.

The circuit court did not err in entering a directed verdict in favor of Brongiel on Erdman's counterclaim.

CONCLUSION

The judgment of the circuit court of Cook County is affirmed.

Affirmed.

WOLFSON and R. GORDON, JJ., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

WILLIAM OLDENSTEDT,
Plaintiff-Appellee,
v.
MARSHALL ERDMAN AND ASSOCIATES, INC.
Defendant-Appellant,
and
BRONGIEL PLUMBING,
Third-Party Defendant-Appellee.

**No. 1-05-1700**

**Appellate Court of Illinois**
**First District, First Division**

**Filed: March 3, 2008**

**JUSTICE GARCIA delivered the opinion of the court.**

**Wolfson and R. Gordon, JJ., concur.**

**Appeal from the Circuit Court of Cook County**
**Honorable James Varga, Judge Presiding**

| For DEFENDANT - APPELLANT | Brian A. Schroeder<br>CASSIDAY SCHADE LLP<br>20 N. Wacker Drive, Suite 1040<br>Chicago, Illinois 60606 |
|---|---|
| For PLAINTIFF - APPELLEE | Robert N. Wadington<br>ROBERT N. WADINGTON & ASSOCIATES<br>111 W. Washington Street, Suite 1460<br>Chicago, Illinois 60602 |
| For THIRD PARTY DEFENDANT- APPELLEE | J. Michael West<br>MAISEL & ASSOCIATES<br>200 N. LaSalle Street, Suite 2000<br>Chicago, Illinois 60601 |